**In re SOUTHEAST BANKING CORPORATION, Debtor.**

**No. 91–14561–BKC–PGH.**

United States Bankruptcy Court, S.D. Florida.

Aug. 6, 2004.

Southeast Banking Corporation, Miami, FL, pro se.

Mark D. Bloom, Greenberg Traurig, LLP, Miami, FL, Stephen D. Busey, Smith Husley & Busey, Jacksonville, FL, for Jeffrey H. Beck, Chapter 7 Trustee.

Robert A. Julian, Winston & Strawn, LLP, San Francisco, CA, John W. Kozyak, Kozyak Tropin & Throckmorton, P.A., Miami, FL, for William A. Brandt, Jr., former Chapter 7 Trustee.

Scott L. Baena, Bilzen Sumberg Baena Price & Axelrod, LLP, Miami, FL, for Ad Hoc Committee of Subordinated Noteholders.

Stephen A. Goodwin, Carrington Coleman Sloman & Blumenthal, LLP, Dallas, TX, Geoffrey S. Aaronson, Adorno & Yoss, P.A., Miami, FL, for Bank of New York, Indenture Trustee.

Paul J. McMahon, Paul Joseph McMahon, P.A., Miami, FL, for Gabriel Capital, L.P.

Craig V. Rasile, Hunton & Williams, LLP, Miami, FL, for U.S. Bank National Association, Indenture Trustee.

*ORDER APPROVING SETTLEMENT AGREEMENT AND AWARDING FINAL COMPENSATION, OVER-RULING OBJECTIONS, AND DIS-CHARGING FORMER TRUSTEE WILLIAM A. BRANDT, JR.*

PAUL G. HYMAN, JR., Bankruptcy Judge.

**THIS MATTER** came before the Court for final evidentiary hearing in West Palm Beach on June 16 and 17, 2004, upon (i) the Motion for Approval of Settlement and Compromise of All Disputes With William A. Brandt, Jr., and Award of Final Compensation for Services of Trustee (the "Settlement Motion"), filed by Jeffrey H. Beck in his capacity as Chapter 7 Trustee of the Estate of Southeast Banking Corporation (the "Estate"), and (ii) the Elected Trustee's Application for Allowance of Prior Holdbacks (the "Brandt Fee Application"), filed by Former Trustee William A. Brandt, Jr.

The Brandt Fee Application seeks approval of payment to Mr. Brandt for total fees and expense reimbursement in the amount of $19,611,853, this amount includes interim awards that have already been paid.

The Settlement Motion seeks approval of a proposed settlement between Mr. Beck and Mr. Brandt as set forth in the March 19, 2004 Settlement Agreement (the "Settlement Agreement"). If approved, the Settlement Agreement would resolve the Brandt Disputes.[1]

The following Objections to the Settlement Motion and Brandt Fee Application have been filed (collectively, the "Objections", and the parties having filed those Objections, the "Objecting Parties"):

(1) Objection of the Ad Hoc Committee of Subordinated Noteholders to the Final Fee Application of William A. Brandt, Jr. and Motion for Approval of Settlement and Compromise of All Disputes with William A. Brandt, Jr. by Jeffrey H. Beck, as Trustee (the "Ad Hoc Committee Objection");

(2) Objection of The Bank of New York, as Indenture Trustee to (1) Motion for Approval of Settlement and Compromise of All Disputes with William A. Brandt, Jr., and Award of Final Compensation for Services as Trustee, and (2) the Final Fee Application of William A. Brandt, Jr. (the "Bank of New York Objection");

(3) Objection of U.S. Bank National Association as Indenture Trustee, to the Final and Supplemental Fee Applications of William A. Brandt, Jr. and Motion for Approval of Settlement and Compromise of All Disputes with William A. Brandt, Jr. by Jeffrey H. Beck, as Trustee (the "U.S. Bank Objection"); and

(4) Joinder of Gabriel Capital, L.P. and its Affiliates in Objection of the Ad Hoc Committee of Subordinated Noteholders to the Final Fee Application of William A. Brandt, Jr. and Motion for Approval of Settlement and Compromise of All Disputes with William A. Brandt, Jr. by Jeffrey H. Beck, as Trustee (the "Gabriel Joinder").

Mr. Beck and Mr. Brandt filed separate Replies to the Objections (collectively, the "Replies").

The Court, having considered the Brandt Fee Application, the Settlement Motion, the Objections, and the Replies, having reviewed the testimony and documentary evidence of record, having observed the candor and demeanor of the witnesses, having heard the argument of counsel, having reviewed the applicable law, and being otherwise fully advised in the premises, hereby issues the following Findings of Fact and Conclusions of Law

---

1. The Settlement Agreement identifies the Brandt Disputes as: (a) Mr. Brandt's Final Fee Application; (b) objections to Mr. Brandt's Final Fee Application; and (c) all claims that Mr. Beck could assert on behalf of the Southeast Estate against Mr. Brandt, including without limitation, all rights to request the Bankruptcy Court to surcharge Mr. Brandt based on his service as Southeast trustee.

in accordance with Fed. R. Bank. P. 7052, as made applicable to this contested matter by Fed. R. Bank. P. 9014.

## FINDINGS OF FACT

### A. Background

1. In September 1991, the Federal Deposit Insurance Corporation (the "FDIC") seized two Florida banks owned by Southeast Banking Corporation ("Southeast" or "SEBC"), Southeast Bank, N.A., and Southeast Bank of West Florida. The seizures of these banks produced the fifth largest bank failure in the United States up to that point in time. Stripped of its operating banks, Southeast filed a Chapter 7 bankruptcy case on September 20, 1991.

2. Jules Bagdan served as the first trustee in the Southeast case from September 23, 1991 until mid-April 1992 when he was replaced by interim trustee Feltman. Mr. Brandt was elected trustee by a vote of creditors in the case on April 14, 1992. He continued as trustee until he resigned on April 1, 1998, when he was succeeded by the current trustee, Jeffrey H. Beck.

3. As trustee, Mr. Brandt sought and received Court approval to retain Greenberg Traurig as his general counsel, Ross & Hardies and J. Joseph Bainton as his special litigation counsel, and Development Specialists, Inc. ("DSI") as his consultant.

4. The Court previously awarded and authorized the Estate to pay Mr. Brandt the sum of $4,332,904 in interim fees for services as Chapter 7 trustee in this case, and $230,213 in interim expense reimbursement. The Court withheld ruling on $805,960 in fees sought by Mr. Brandt in his interim applications. The Brandt Fee Application filed February 17, 2004, seeks an additional payment of $12,748,946 in fees and an additional payment of $2,299,789 in expense reimbursement for the litigation expenses Mr. Brandt incurred defending his actions as Southeast trustee. Therefore including the interim awards, Mr. Brandt seeks approval of total fees and expense reimbursement in the amount of $19,611,852.[2]

5. On January 15, 2004, Mr. Beck and Mr. Brandt entered into a Stipulation agreeing on a procedure for resolving the Brandt Disputes. The Stipulation provided for Mr. Beck and Mr. Brandt to submit to mediation. If the mediation was successful the Court would conduct a hearing on any resulting motion to approve settlement and objections thereto. If the mediation was unsuccessful, the Stipulation called for an evidentiary hearing on the Brandt Fee Application and any objections thereto.

6. The Court approved the Stipulation in its January 23, 2004 *Order Approving Stipulation, Directing Mediation of Claim and Compensation Issues Relating to Former Trustee Brandt, Setting Deadlines, and Scheduling Further Hearings* (the "January 23, 2004 Order"). The January 23, 2004 Order was served on all parties in interest having appeared in the case, and expressly afforded each such party in interest an opportunity to seek rehearing or reconsideration.[3] No party in interest

---

**2.** The Brandt Fee Application includes the time and expenses of other Development Specialists, Inc.'s professionals who assisted Mr. Brandt in the administration of the Estate during his tenure as Chapter 7 trustee.

**3.** The Court's January 23, 2004 Order approved the directed mediation of the Brandt Disputes. The order also provided that "the terms, conditions and deadlines set forth in this Order shall be binding on all parties in interest in this case," unless a party filed "a motion for rehearing within ten (10) days from the entry of this order."

filed a motion for rehearing or reconsideration.

7. Pursuant to the Stipulation and the January 23, 2004 Order, Mr. Beck and Mr. Brandt exchanged mediation statements [4] wherein the Estate's claims against Mr. Brandt and Mr. Brandt's claims against the Estate were identified and advocated. The proposed settlement arises out of a two-day mediation conducted by the Honorable Herbert Stettin on February 27 and 28, 2004, and a series of conferences between and among Mr. Beck, his counsel, counsel for Mr. Brandt, and Judge Stettin over several days immediately following the mediation sessions.

8. The Settlement Motion seeks Court approval of total fees and expense reimbursement for Mr. Brandt in the amount of $7,863,117. This compromise sum represents approximately $11.75 million less than the amount sought in the Brandt Fee Application. If approved the settlement would require the Estate to pay Mr. Brandt $3.3 million in addition to the $4,332,904 in fees and $230,213 in expense reimbursement previously paid to him on an interim basis. The proposed additional payment of $3.3 million represents $2,494,000 in excess of Mr. Brandt's total hourly fees plus $805,960 held back from the interim applications.

9. The Settlement Agreement would resolve the Brandt Fee Application, the Estate's objections thereto, and the Brandt Disputes in exchange for the proposed payment. The settlement also calls for the exchange of mutual releases of all claims between the Chapter 7 Estate and Mr. Brandt with certain limited exceptions reserved by Mr. Brandt solely for defensive purposes.

## B. *Mr. Brandt's Accomplishments as Trustee.*

10. Three witnesses testified at the hearing: Mr. Brandt, Attorney Mark D. Bloom (counsel for each of the Estate's four successive trustees), and Mr. Beck. Mr. Brandt, Mr. Beck and the parties to the Objections introduced a number of exhibits. The evidence shows that the results Mr. Brandt obtained for the Estate during his tenure as trustee were exceptional.

11. Mr. Brandt testified that when he became trustee, the FDIC had asserted claims against the Estate in excess of half a billion dollars on behalf of the Southeast Bank Receivership estates. In addition, general unsecured creditors had filed claims against the Estate in excess of $800 million. Thus, the total unsecured claim pool was approximately $1.3 billion. At that time, the Estate had approximately $80 million in assets. In response to creditor inquiries, Mr. Brandt estimated that the case might result in distributions to unsecured creditors of three to five cents on the dollar. Mr. Brandt testified that the expectations of the Subordinated Indenture Trustees (The Bank of New York and Morgan Guaranty Trust, the latter as predecessor in interest to U.S. Bank) were less optimistic than his own, and that they expressed concern that his estimate of a three to five cent dividend in the case would create unrealistic expectations among the bondholders which would make their jobs more difficult.

12. After his election as trustee, Mr. Brandt instituted a number of lawsuits against the FDIC and the Debtor's former directors, officers and certain of its professionals. The primary lawsuit against the

---

4. The Mediation Statements were filed under seal and introduced as Exhibits at the June 16 and 17, 2004 evidentiary hearing.

FDIC, both in its corporate capacity and as Receiver for Southeast Bank, N.A. ("SEBNA") and Southeast Bank of West Florida ("SEBWF"), was filed in the District Court for this district in March 1993 (the "FDIC Litigation"), and assigned to then-District Judge Stanley Marcus.

13. Mr. Bloom, who served as counsel of record in the FDIC Litigation, testified that the two principal claims in the FDIC Litigation were (i) to recover on $152 million in Subordinated Capital Notes that had been issued by SEBNA to SEBC, and (ii) to compel the FDIC as Receiver to call a meeting of the shareholders of SEBNA in accordance with the National Bank Act. If the shareholder meeting were held Mr. Brandt as trustee of Southeast, the sole shareholder of SEBNA, would be able to vote to discontinue the FDIC as Receiver and to elect himself as the Successor Agent to assume control of the remaining assets in the SEBNA Receivership estate.

14. Mr. Bloom testified that the FDIC resisted and defended the claims for payment on the Subordinated Capital Notes on the grounds that (i) the Notes were in the nature of preferred stock subordinated to the payment of principal and interest on all allowed claims against the SEBNA Receivership, and (ii) it was the practice of the FDIC in administering failed bank receiverships to disregard obligations owed by the failed bank to any related institution or entity.

15. Mr. Brandt testified that he had previously dealt with the FDIC in other bank failure cases including the Bank of New England and Florida Park Banks cases. Mr. Brandt further testified that based upon his prior experience, he believed it necessary that the FDIC Litigation be conducted in an aggressive fashion, and that the FDIC would capitulate only under the direct and immediate pressure of a pending trial or summary judgment motion. As Mr. Bloom testified, it proved to be only under the threat of summary judgment before Judge Marcus in June 1994 that the FDIC capitulated and offered to pay the full $152 million on the Subordinated Capital Notes.

16. The FDIC initially demanded that the remainder of the FDIC Litigation be dismissed with prejudice as a condition for payment of the $152 million. Mr. Brandt refused to accept the FDIC's condition. Upon the FDIC's payment of $152 million in cash, the only counts that were dismissed in the FDIC Litigation were the two counts seeking recovery on the Subordinated Capital Notes.

17. The remaining counts of the FDIC Litigation were litigated over three more years. According to Mr. Bloom's testimony, the FDIC expressed a willingness to consider a meaningful settlement only when District Judge Daniel T.K. Hurley, to whom the case had been reassigned after reaching the $152 million settlement, was able to schedule a definite trial date in August 1997. The settlement was obtained only after extensive discovery into the FDIC's administration of both the SEBNA and SEBWF Receivership estates, and reconciliation of billions of dollars in accounting entries on the books of those Receiverships.

18. In the ultimate settlement approved by this Court in early 1998, the FDIC agreed to the relief sought by Mr. Brandt under the National Bank Act. As a result of that settlement Mr. Brandt was elected as Successor Agent, and the Estate acquired control of cash and other assets in the FDIC Receiverships with a value in excess of $125 million.

19. Mr. Beck testified that Mr. Brandt's contribution to the success of the case was very substantial and he credited Mr. Brandt with realizing approximately

$350 million in benefits to the Estate. Mr. Beck noted that Mr. Brandt's aggressive approach coupled with his tenacity in holding onto assets rather than quickly dumping them increased their value to the Estate.

20. During the past 12 years, the Estate's trustees and professionals have collected over $500 million in litigation recoveries and asset liquidations, distributed 100 percent of all allowed creditor claims, distributed postpetition interest on all creditor claims, and paid millions of dollars in fees and expenses to the creditors' indenture trustees and attorneys. Mr. Brandt's administration achieved the bulk of these results. During his six-year tenure as trustee, Mr. Brandt and his professionals: (i) aggressively pursued the FDIC and recovered all money owed to the Estate under the Estate's best claims, an amount that equaled approximately $300 million; (ii) liquidated the non-bank subsidiary assets for tens of millions of dollars more than their initial valuation; (iii) reduced the creditor claim pool from $1.3 billion to $370 million; and (iv) charted the Estate's course for litigating claims against Southeast's former officers, directors and professionals in four lawsuits.

21. The Southeast case is one of the success stories of modern bankruptcy administration. Indeed Mr. Brandt testified that, as reported to him by the U.S. Trustee's Office, the distributions to creditors in the Southeast case accounted for 30% of all Chapter 7 liquidation distributions to creditors in the nation during the 1990's. The results in this case are unprecedented on another level. Chapter 7 holding companies in such cases have rarely, if ever, recovered any substantial distributions from FDIC managed bank liquidations.

## C. *Mr. Brandt's Alleged Transgressions as Trustee*

22. During his tenure as trustee, Mr. Brandt prosecuted claims against Southeast's former officers, directors and professionals in four lawsuits that were subsequently dismissed by the District Court. The lawsuit against Southeast's former directors and officers (the "Directors Litigation") was dismissed by the District Court as a sanction for discovery violations committed by Mr. Brandt, as trustee, and his counsel. In the other three cases, the District Court dismissed the Estates' lawsuits against Southeast's former professionals, Deloitte & Touche, Steel Hector & Davis, and Lazard Freres on statute of limitations grounds.

23. Mr. Beck asserted that the dismissals in the above actions created additional legal expenses for the Estate. While the four cases were on appeal, Mr. Beck filed a complaint against Mr. Brandt in order to preserve the Estate's potential claims against Mr. Brandt for breach of fiduciary duty by allegedly failing to file the Estate's lawsuits against Southeast's former professionals on a timely basis, and by allegedly contributing to the discovery violations that resulted in the District Court's dismissal of the Directors Litigation. This Court dismissed Mr. Beck's suit against Mr. Brandt without prejudice in 2000. In dismissing that suit the Court ruled that for purposes of section 322(d),[5] Mr. Brandt was not discharged as trustee and that he would not be discharged as trustee without further order of the Court. Thus the claims alleged would remain active until the cases were resolved on appeal.

### A. *The Deloitte Action*

24. As trustee, Mr. Brandt sued Deloitte for professional malpractice on Sep-

---

5. 11 U.S.C. 322(d) provides: "A proceeding on a trustee's bond may not be commenced after two years after the date on which such trustee was discharged."

tember 21, 1993—two years and one day after Southeast's chapter 7 petition was filed. The District Court dismissed the complaint as untimely, ruling that the cause of action accrued in 1988, and therefore the statute of limitations expired in 1990 (by reason of Florida's two-year from date of discovery statute of limitations for professional malpractice). The District Court ruled that Mr. Brandt had not adequately pled that Southeast's directors were acting adversely to its interests so as to avoid imputation of their knowledge to Southeast as early as 1988.

25. On appeal the Eleventh Circuit reversed the dismissal ruling that the complaint adequately pled the adverse interest exception to imputation, and remanded the case for trial. *Beck v. Deloitte & Touche,* 144 F.3d 732 (11th Cir.1998).

26. Mr. Brandt testified that the filing of the Deloitte complaint two years and one day after the filing of the bankruptcy petition was within two years of the appointment of the initial trustee in the case, and thus timely based upon the adverse interest doctrine as found applicable by the Eleventh Circuit. In Mr. Brandt's view, the initial trustee would have been the first party not disabled by an adverse interest. Mr. Brandt, who is not an attorney, testified that he filed the Deloitte complaint when he did based on Mr. Bainton's legal advice concerning the impact of the adverse interest principle, and that he believed it would be necessary to establish adverse interest even if the case had been filed within the two-year period under section 108 of the Bankruptcy Code.[6] Mr. Brandt maintained that any damages asserted were speculative and were covered by Mr. Beck's settlement with Ross & Hardies which is discussed below.

27. Mr. Beck asserted that Mr. Brandt breached his fiduciary duty to the Estate by failing to file the action against Deloitte & Touche within the safe harbor provision of section 108. Mr. Beck testified that the question of when chargeable knowledge of the alleged Deloitte malpractice reached various officers of Southeast, and whether such officers were "adversely interested" at the time they acquired knowledge, remained contested factual issues despite the reversal of the dismissal on appeal. Mr. Beck further testified that in the course of discovery he became aware that some of the debtor's officers who may not have been "adversely interested" may have acquired knowledge of facts indicating malpractice by Deloitte within two years of the petition date. Thus, Mr. Beck testified, had the case gone to trial the safe harbor of section 108 may have been essential depending upon the findings regarding the knowledge and adverse interest of such officers.

28. On remand, Mr. Beck settled the Deloitte action by accepting $4.95 million from Deloitte. A Deloitte motion for summary judgment was pending at the time of the settlement. Mr. Beck testified that Mr. Brandt's failure to file the Deloitte action within the section 108 period had a negative impact on the settlement and increased litigation expenses to the Estate resulting in damage to the Estate of an estimated two million dollars.

29. Mr. Beck acknowledged however that the damages asserted against Mr. Brandt in connection with the Deloitte case were imprecise and as discussed below, were part of the claims against Ross & Hardies that were settled.

### B. The Steel Hector & Davis Case

30. The Steel Hector & Davis case concerned the Estate's malpractice claims

---

6. 11 U.S.C. § 108 extends the unexpired portion of any applicable statute of limitations for an additional two years from the date a bankruptcy petition is filed.

against Southeast's prepetition counsel, Steel Hector & Davis. In an unpublished opinion the Eleventh Circuit reversed the Steel Hector & Davis dismissal based upon the adverse interest exception to the statute of limitations, the same grounds upon which the Deloitte dismissal was reversed. As discussed below, Mr. Beck settled the claims against Steel Hector & Davis upon reversal of the dismissal.

### C. The Lazard Freres Case

31. The Lazard Freres case concerned the Estate's breach of contract claims against Southeast's prepetition investment advisor, Lazard Freres. Unlike the Deloitte and the Steel Hector & Davis dismissals, the Lazard Freres dismissal was affirmed by the Eleventh Circuit. In affirming the District Court ruling, the Eleventh Circuit noted that Florida's five year statute of limitations period for breach of contract claims begins to run "after the cause of action accrue[s] regardless of whether the plaintiff knew it had a claim." *Beck v. Lazard Freres & Co., LLC,* 175 F.3d 913, 914 (11th Cir.1999)(citing *Federal Ins. Co. v. Southwest Florida Retirement Center, Inc.,* 707 So.2d 1119 (Fla.1998))(construing Fla. Sta. 95.11(2)(b)). Thus the adverse domination discovery exception did not toll the breach of contract limitations period. The evidence indicated that the Lazard Freres dismissal was unrelated to any action or lack of action by Mr. Brandt.

### D. The Directors and Officers Action

32. After his election as trustee in 1992, Mr. Brandt retained attorney J. Joseph Bainton of the New York-based law firm of Whitman & Ransom, and later Ross & Hardies, to prosecute the Estate's claims against Southeast's former directors, officers and professionals, and to prosecute certain other claims against the FDIC. Magistrate Judge Barry L. Garber issued a Report and Recommendation to Chief Judge Edward B. Davis recommending dismissal of the Directors Litigation as a sanction for Mr. Brandt and Mr. Bainton's willful misconduct and abusive litigation practices. Judge Davis subsequently adopted the Report and Recommendation and dismissed the Directors Litigation. *In re Southeast Banking Corp.,* 212 B.R. 397 (S.D.Fla.1997). The findings of willful misconduct related to:

a. Mr. Brandt and Mr. Bainton's issuance of Bankruptcy Rule 2004 and Rule 45 subpoenas to third parties in violation of a series of orders staying discovery; and

b. Mr. Brandt and Mr. Bainton speaking to the press in violation of an order prohibiting them from disclosing the contents of disputed documents to anyone, or from using the documents for any purpose.

33. Mr. Beck asserted that Mr. Brandt breached his duties as trustee by violating the District Court's orders in the Directors Litigation. Mr. Beck testified that during the mediation he had asserted that dismissal of the Directors Litigation imposed additional costs on the Estate including (i) incremental professional fees and expenses of approximately $2.9 million, (ii) a $1.8 million reduction in the directors and officers' insurance policy limits available for settlement because the defendants continued to erode the limits through three more years of litigation, (iii) approximately $1 million in the time value of money attributed to the delay in obtaining settlement, and (iv) $850,000 paid to the Ad Hoc Committee for reimbursement of its legal expenses in pursuing Mr. Brandt's removal as trustee.[7] Mr. Beck testified that the

---

7. In late 1997, the Ad Hoc Committee moved to remove Mr. Brandt as trustee, based on the District Court's finding of willful misconduct and the allegation that as a result of that finding Mr. Brandt had a conflict of interest in prosecuting the appeals of the dismissals of

most significant claim against Mr. Brandt was for the costs to the Estate that arose from dismissal of the Directors Litigation. However, Mr. Beck testified that the above listed damages asserted during the mediation were not determined with specificity. Moreover, these damages were part of the damages asserted in connection with the Estate's settlement with Mr. Brandt's special litigation counsel Ross & Hardies which is discussed below. Mr. Beck acknowledged that Mr. Brandt's actions, which led to the finding of willful misconduct, were not undertaken for his own benefit or personal gain, but rather in an effort to benefit the Estate by pursuing an aggressive litigation strategy.

34. Regarding the willful misconduct findings, Mr. Brandt testified that he did not become aware of the offending subpoenas until after they were issued. After learning about the subpoenas, Mr. Brandt testified that he relied on Mr. Bainton's legal advice that the subpoenas did not violate the stay orders. Mr. Brandt also testified that he relied on Mr. Bainton's legal advice in making his statements to the press regarding the *importance* of the disputed documents, and believed that in so doing he did not violate the order prohibiting him from speaking to the press about the *contents* of those documents. The Ad Hoc Committee did not dispute Mr. Brandt's reliance upon his counsel's legal advice or submit any evidence to contradict his testimony.

35. Mr. Brandt further testified that based on legal advice of counsel, he believed that he could and should respond to a Miami Business Review reporter's call,

that he could not disclose any of the information contained in the documents, but that he could comment on the severity of the documents. When the reporter asked what Mr. Brandt would do if the District Court ordered the return of the papers, Mr. Brandt said he felt "like Daniel Ellsberg must have felt when he got his hands on the Pentagon Papers." Chris Boyd, *Trustee: I'd Love to Show the Smoking Gun*, MIAMI DAILY BUS. REV., May 2, 1996 at 1. In making that comment, Mr. Brandt stated that he believed he was adhering to the District Court's order not to disclose information from the documents, but responding to the reporter's question in a way that was consistent with counsel's legal advice about the scope of the order.[8] The District Court ruled otherwise, but did not rule on whether Mr. Brandt's reliance on advice of counsel was appropriate or mitigated his actions. During his testimony, Mr. Brandt stated that if he had to do it over again, he would have worded his comment differently, and he apologized for making the comment.

36. Mr. Brandt also asserted that the damages alleged by Mr. Beck were speculative and primarily related to the District Court's judicial error in dismissing the Directors Litigation. In addition, Mr. Brandt argued that the proceeds of the settlement of the Estate's malpractice claim against Mr. Bainton and Ross & Hardies, discussed below, were greater than any damages Mr. Brandt allegedly caused the Estate, including the alleged damages arising out of the Directors Litigation. Mr. Brandt testified that he had

---

the Directors Litigation and the professionals cases. Mr. Brandt resigned just prior to the evidentiary hearing on the removal motion.

8. Mr. Bainton is quoted in the Miami Daily Business Review as stating that suppressing the documents "would be like suppressing the

gun in a murder investigation." Chris Boyd, *Trustee: I'd Love to Show the Smoking Gun*, MIAMI DAILY BUS. REV., May 2, 1996 at 1. This is corroboration that Mr. Brandt followed Mr. Bainton's legal advice in making statements to the press.

undertaken the aggressive litigation of these matters and engaged in the conduct that was found offensive by the courts for the benefit of the Estate, and not for his own personal benefit.

37. On appeal, the Eleventh Circuit held that the District Court had abused its discretion by dismissing the action without considering lesser sanctions because the dismissal injured the represented parties, i.e. the creditors—the real parties in interest—who were not involved in the misconduct. *Beck v. Bassett (In re Southeast Banking Corp.)*, 204 F.3d 1322, 1334–35 (11th Cir.2000).

38. On remand, Mr. Beck settled the Directors Litigation in exchange for the former directors and officers' insurer paying the Estate $9 million, and for the former directors and officers releasing approximately $18 million in claims against the Estate.

### E. The Trustee's Settlement with Ross & Hardies and Steel Hector

39. Mr. Beck alleged malpractice claims against Ross & Hardies based in large part on the dismissals of the four cases discussed above. The same malpractice insurer represented both Steel Hector & Davis, and Ross & Hardies. Mr. Beck settled the Estate's malpractice claims against both Ross & Hardies and Steel Hector & Davis. The settlement provided an aggregate payment to the Estate of $26 million. Mr. Beck testified that the predominant amount of the $26 million settlement proceeds was in respect of the malpractice claims against Ross & Hardies.

### F. The FDIC Post Closing Documents

40. Mr. Brandt and Mr. Bainton's conduct relating to documents the FDIC generated in connection with the SEBNA Receivership—referred to by the District Court as the "Post–Closing Documents"—led to the entry of an order entitling the FDIC to recover fees against the Estate as a sanction. Magistrate Judge Garber ordered Mr. Brandt to show cause before District Judge Davis why he should not be held in contempt for his handling of the Post–Closing Documents.

41. Mr. Brandt reached a settlement with the FDIC prior to the District Court hearings to determine the amount of sanctions and whether Mr. Brandt should be held in contempt.

42. Mr. Beck asserted in the mediation that Mr. Brandt's conduct and the pendency of the sanctions caused the Estate to incur needless additional expense and led to a settlement that may have been timed to eliminate the threat of sanctions. Notwithstanding his mediation posture, Mr. Beck testified that the fees expended by the Estate in the sanctions and contempt litigation were relatively minimal, and that the pendency of that litigation probably had no impact on the final settlement with the FDIC. Mr. Beck acknowledged that the timing of the settlement actually resulted from the FDIC Litigation being set for trial. Finally, Mr. Beck testified that the final settlement with the FDIC achieved a highly successful result, and that there was no reason to believe that any better result was obtainable.

43. Mr. Brandt testified that the pendency of the sanctions and contempt proceedings had no effect on the final settlement in the FDIC Litigation. As explained by Mr. Brandt and corroborated by Mr. Bloom, the final settlement granted the full relief sought under the National Bank Act. Thus, Mr. Brandt was able to assume the position of Successor Agent to the FDIC as Receiver for SEBNA, and the Estate acquired the benefit and control of more than $125 million in cash and other assets remaining in the SEBNA Receivership, thereby enabling creditors to receive full pay-

ment of their allowed claims plus postpetition interest.

## D. *The Objections*

44. The Objections argue that the Court should deny all fees to Mr. Brandt and disgorge fees already paid, or in the alternative that the Court should substantially reduce Mr. Brandt's fee request based upon on several grounds including that:

(a) Mr. Brandt and his professionals' recoveries against the FDIC were not exceptional because they allegedly "totally misperceived the essence of the claims against the FDIC" thereby delaying ultimate settlement, and that a member of the Ad Hoc Committee rather than Mr. Brandt was actually responsible for the theory of recovery against the FDIC;

(b) Mr. Beck allegedly did not give reasonable deference to the views of creditors, as required by applicable law in structuring the settlement, because over 50% of the creditors "vehemently objected" to the payment of any fees to Mr. Brandt;

(c) Mr. Brandt allegedly breached his fiduciary duty to the Estate in the Director Litigation and such breaches damaged the Estate and should result in a reduction of fees to Mr. Brandt;

(d) the pendency of the sanctions and contempt litigation adversely affected the Estate's recovery in the FDIC Litigation and should result in a reduction of fees to Mr. Brandt; and

(e) the District Court's findings with respect to Mr. Brandt and his counsel's willful misconduct in connection with discovery violations bars payment of all fees and requires Mr. Brandt to disgorge all money the Estate has paid to him without inquiry as to whether or not Mr. Brandt's other services to the Estate justify the Court

awarding him compensation for the reasonable value of those services.

45. With respect to the above listed objections, the Court notes that:

(a) A memorandum from Ad Hoc Committee member Mark Brodksy was introduced into evidence as an Exhibit. It is the Ad Hoc Committee's contention, based upon that memorandum, that Mr. Brodsky was principally responsible for developing the ultimate theory of recovery against the FDIC, and that the actions of Mr. Brandt and his counsel served merely to delay settlement and increase the Estate's expenses. Mr. Brandt and Mr. Bloom both testified that this was not the case. Mr. Bloom further testified it was his partner Ms. Bass who, upon instructions from Mr. Brandt to pursue the FDIC Litigation aggressively, had developed the legal theory for the claim against the FDIC under the National Bank Act. Mr. Brandt and Mr. Bloom both testified that the timing of the settlement was due to the FDIC's refusal to consider a settlement involving relief under the National Bank Act until Judge Hurley set a firm trial date for the case;

(b) The uncontroverted testimony of Mr. Beck was that, prior to, during, and following the mediation with Mr. Brandt, Mr. Beck commenced and continued an extensive dialogue with representatives of the Objecting Parties. Pursuant to confidentiality agreements since filed with the Court, Mr. Beck shared both his and Mr. Brandt's mediation statements and engaged in extensive discussions with certain of the Objecting Parties regarding the Brandt Disputes, the Brandt Fee Application, and related issues. The Objecting Parties took and urged Mr. Beck to take the position that, based upon the District Court's undisturbed finding of willful misconduct, Mr. Brandt should not only be denied additional compensation and expense reimbursement, but that he should

be required to disgorge all interim compensation previously awarded and paid to him. Mr. Beck testified that in his opinion the position of the Objecting Parties was unreasonable and inconsistent with the range of likely results. Because of his respect for the Objecting Parties Mr. Beck attempted, in spite of his conclusion that their view was unreasonable, to achieve a settlement in a range as close to their view as possible until he concluded that such a settlement was unachievable. Mr. Beck testified that his duties to the Estate required him to exercise his judgment to effectuate a settlement within the range that he concluded was reasonable;

(c) Mr. Beck testified that the $26 million combined settlement with Ross & Hardies and Steel Hector & Davis exceeded any damages suffered by reason of Mr. Brandt's misconduct. The Ross & Hardies settlement constituted the majority of the $26 million received by the Estate and included matters other than those which were the subject of allegations against Brandt. Mr. Beck further testified that it would have been difficult, if not impossible, to determine whether the Estate was entitled to any further damages relating solely to Mr. Brandt's conduct;

(d) Mr. Beck further testified that the pendency of the sanctions and contempt litigation had no impact on the settlement of the FDIC Litigation, and that any fees paid for litigating the sanctions and contempt issues were relatively minimal; and

(e) Mr. Beck also testified on cross-examination that the Brandt fee applications, and in particular the Brandt time records, were the most detailed fee applications with far more description than any he had ever seen. The Objecting Parties did not file any objections, nor introduce any evidence at trial to dispute the actual time entries or to allege that there were any duplicate entries. In addition, Mr. Beck testified that none of the Objecting Parties ever questioned actual time entries or suggested that there were duplicate entries. Mr. Beck also stated that he was able to analyze the reasonable necessity of the time incurred based upon the complexity of the matters using a special computer program to compare the Brandt fee applications to other fee applications. Based upon this analysis, Mr. Beck concluded that the fee applications did not contain duplicate entries, excessive time, or other problems.

46. On June 14, 2004 the Court entered two orders: 1) *Order Denying Objectors' Motion To Strike Portions Of Mediation Statements And To Exclude Evidence At June 16th Hearing Based On Doctrines Of Law Of The Case And Collateral Estoppel;* and 2) *Order Overruling Objections To The Extent The Objections Are Based On Denial Of All Fees As A Matter Of Law* (collectively, the "June 14 Orders"). The June 14 Orders overruled the Objecting Parties argument that the District Court's willful misconduct findings preclude a fee award to Mr. Brandt as a matter of law without inquiry into whether or not Mr. Brandt's other services to the Estate justify an award of compensation for the reasonable value of those services.

## E. *The Mediated Settlement Agreement*

47. The Settlement Agreement resolves Mr. Brandt's claim to over $19 million in fees and expense reimbursement and Mr. Beck's claim that he has a right to bring a breach of fiduciary duty or surcharge claim against Mr. Brandt in an effort to reduce or eliminate his fee request. The Settlement Agreement would reduce Mr. Brandt's total request for fees and expenses by approximately $11.75 million. The Brandt Fee Application includes a claim for reimbursement of litigation expenses Mr. Brandt incurred defending the

litigation against him with respect to the statute of limitations losses and discovery violations. This claim would essentially be withdrawn under the Settlement Agreement.

48. Mr. Beck testified that the settlement is within the range of reasonableness and in the best interests of the Estate. Following the filing of Mr. Brandt's application for payment of holdback amounts, Mr. Beck retained special counsel to assist him in identifying, analyzing and, if necessary, litigating whatever rights the Estate had against Mr. Brandt and whatever entitlement Mr. Brandt had to compensation from the Estate. In addition, Mr. Beck received the advice of special counsel, the Estate's accountant, and special litigation counsel with respect to all aspects of the mediation. Mr. Beck testified that based upon this advice and his investigation of the matters involved he concluded the following:

(a) Mr. Brandt's actions or inactions with regard to the subpoenas, speaking with the press, and the Post–Closing Documents were the result of poor judgment, but for the most part were undertaken in reliance upon legal advice of counsel, and not with actual intent to violate court orders. Further, the offending actions were undertaken for the benefit of the Estate rather than for any motives of personal gain. These actions did however cause the Estate to incur damages, albeit of a nature difficult to determine and quantify.

(b) Mr. Brandt and his attorneys independently developed the theory of recovery against the FDIC that ultimately prevailed, and the FDIC did not agree to the final settlement in the FDIC Litigation until trial had been set for a date certain.

(c) Mr. Brandt achieved much success during his tenure as trustee, and produced in excess of $350 million of recoveries for the Estate. Accordingly, absent the District Court's findings of willful misconduct and the other conduct that damaged the Estate, Mr. Brandt would be entitled to substantial fees in excess of his hourly rates, subject to the cap imposed by 11 U.S.C. § 326. In the absence of such conduct, Mr. Beck estimated Mr. Brandt would have been entitled to reasonable compensation of twice his hourly rate or more, resulting in a total fee in excess of $10 million. Notwithstanding this analysis, Mr. Brandt had engaged in misconduct harmful to the Estate and inappropriate for a trustee. However Mr. Beck believed that proof of any substantial damages from such conduct in excess of recoveries from Ross & Hardies would be difficult to establish. On balance, therefore, Mr. Beck was of the opinion that Mr. Brandt obtained substantial benefits for the Estate and would receive substantial compensation.

(d) Nevertheless, Mr. Beck concluded that a court would not take lightly Mr. Brandt's transgressions or their consequences to the Estate. As a result, Mr. Beck determined that a court resolving the Brandt Disputes would conclude that Mr. Brandt should suffer a reduction in the ultimate award of compensation to which he would be entitled. In resolution of the Brandt Disputes, Mr. Beck believed that a court would probably award fees to Mr. Brandt of $3 to 5 million in excess of Mr. Brandt's unpaid hourly fees of $805,960, for an additional award of approximately $3.8 million to $5.8 million (or total compensation of approximately $8.139 to 10.139 million). Mr. Beck estimated that in light of such transgressions a court would reduce by $1 to $2 million what the award would have been, thereby effectuating relief for the Estate and recognition of Mr. Brandt's transgressions (in spite of the difficulty of proof of damages).

(e) Mr. Beck estimated that the Estate's fees and litigation costs in a vigorously

contested proceeding to reach the result of additional compensation to Mr. Brandt of $3.8 to $5.8 million would exceed $1 million, and consume several years including appeals. Thus, Mr. Beck determined that a settlement involving payment of an additional $3.3 million to Mr. Brandt was eminently reasonable. This would reduce the Estate's exposure, including the expense of litigation, from a range of $4.8 million to $6.8 million to the settlement amount of $3.3 million and save several years of litigation.

(f) As noted above, Mr. Beck believed that the position and views expressed to him by the Objecting Parties were unreasonable and inconsistent with the range of likely results.

### F. *The Court's Findings*

49. Upon the evidence presented, the Court finds that:

(a) Mr. Brandt enhanced the Estate by his administration to the extent of over $350 million of recoveries and is to be credited with the achievement of outstanding results in a very complex case;

(b) Mr. Brandt is to be credited with a highly successful result in the FDIC Litigation. Any misconduct in the related FDIC actions did not adversely affect the outcome or timing of the ultimate settlement and was based upon Mr. Brandt's reasonable reliance on the actions and legal advice of his counsel;

(c) Mr. Brandt's conduct, as trustee, in connection with the Directors Litigation, the FDIC Post Closing Documents, and making statements to the press resulted in significant but largely unquantifiable damages;

(d) Mr. Brandt failed to assure that his counsel would file the Deloitte complaint within the two-year safe harbor period of section 108 of the Bankruptcy Code, which failure had a negative impact on Mr. Beck's settlement negotiations with Deloitte, the consequences of which, however, are also largely unquantifiable;

(e) the aforesaid misconduct by Mr. Brandt was the result of the actions and poor legal advice of his counsel, Mr. Bainton and Ross & Hardies;

(f) the Ross & Hardies settlement substantially, if not entirely, compensated the Estate for this harm;

(h) Mr. Brandt's conduct was not for personal gain but as part of his vigorous and aggressive pursuit of Estate objectives and interests;

(i) Mr. Brandt would have been entitled to an award of final compensation in excess of $10 million but for Mr. Brandt's aforesaid misconduct which was the product of his reasonable reliance on legal advice of counsel, Mr. Bainton and Ross & Hardies;

(j) in the absence of settlement, based upon the evidence presented, the Court would have awarded Mr. Brandt total fees in the amount of $9,249,955 less the $4,332,904 already received, resulting in an additional award of compensation to Mr. Brandt of $4,917,051; and

(k) that a trial on the merits of the Estate's claims against Mr. Brandt and Mr. Brandt's request for compensation and reimbursement of expenses together with expected appeals would consume several years of time and would cost the Estate several hundred thousand dollars and perhaps in excess of $1 million as Mr. Beck estimated.

50. Accordingly, the Court finds that the proposed settlement wherein Mr. Brandt will receive an additional payment of $3.3 million or total compensation of $7,632,904 and an exchange of releases is within the range of reasonableness based

upon all of the above facts, the time and expense of litigation, and the range of likely outcomes of litigation of the Brandt Disputes. From the Estate's perspective, the settlement is at or below the most beneficial end (i.e., paying the least amount of money) of the range of reasonableness.

51. Further, the Court finds that the views and positions of the Objecting Parties with respect to the Brandt Disputes are not reasonable under all of the facts and circumstances, and in light of the evidence presented. The evidence does not demonstrate the type of egregious conduct that should result in a total denial of compensation given the facts, circumstances, and mitigating considerations in this case. The Court finds that the evidence demonstrates that Mr. Brandt should be compensated for the extraordinary achievements he brought to bear on the success of the Estate and that he should be penalized by an appropriate reduction in that compensation by reason of his transgressions. On balance, Mr. Brandt's achievements far outstrip any harm to the Estate for which it has not been otherwise compensated. The Objecting Parties' insistence that Mr. Brandt receive no additional compensation and disgorge all compensation previously awarded and paid is unreasonable.

52. Finally, independent of the settlement advanced by Mr. Beck, based upon the evidence presented, the exceptional results achieved, the conduct of Mr. Brandt, the mitigation of Mr. Brandt's misconduct due to his reasonable reliance on legal advice of counsel, and all of the surrounding facts and circumstances, the Court finds that an award of final compensation of $7,632,904 is fair and reasonable for his services as trustee. On balance, Mr. Brandt's services provided a significant benefit to the Estate and its creditors. Such award compensates Mr. Brandt fairly

for the necessary and reasonable services he performed in connection with his performance and his stewardship of the Estate during his tenure. The settlement award is approximately $2.6 million less than the Court would have awarded in the absence of the problems engendered in part by Mr. Brandt's misconduct which was based upon his reasonable reliance on legal advice of counsel. The settlement award is approximately $1.6 million less than the Court would have awarded to Mr. Brandt in the absence of the settlement after taking full account of his misconduct. Thus under the settlement, the Estate is more than adequately and fairly compensated for any of the consequences of Mr. Brandt's conduct not already compensated by the settlement with his counsel Ross & Hardies.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

### I. *The Court's Independent Review of the Brandt Fee Application*

■ Mr. Beck and Mr. Brandt, with Court approval pursuant to the January 23 2004 Order, stipulated to submit to mediation as part of an agreed procedure to resolve all of the Brandt Disputes including Mr. Brandt's entitlement to fees and expense reimbursement. Although the Objecting Parties were expressly given the opportunity to move for reconsideration of the June 23, 2004 Order, no such motions were filed. Nonetheless, the Objecting Parties argue that a Rule 9019 motion to approve the settlement that was reached cannot supplant the Court's independent duty to determine the reasonableness of Mr. Brandt's fee award. The Court agrees. *See, In re Busy Beaver Building*

*Centers, Inc.*, 19 F.3d 833, 841 (3d Cir. 1994) (determining that a bankruptcy court not only has the power but the duty to review fee applications even in the absence of objections); *In re Cascade Oil Co., Inc.*, 126 B.R. 99, 106 (D.Kan.1991) ("In the absence of objections to the fee application, the court still has the independent judicial duty to determine whether compensation is reasonable"); *In re The Kitchen Lady, Inc.*, 144 B.R. 544, 546 (Bankr.M.D.Fla.1992)("... it is fundamental that the court has an independent duty to review fee applications for reasonableness and to allow only reasonable compensation for actual, necessary services rendered by the trustee..."). Moreover, the Court's determination of whether a settlement dealing with the former trustee's award of fees falls within the range of reasonableness is analytically inseparable from the Court's consideration of whether the former trustee is entitled to an award of fees and the amount, if any, of such an award. The two matters are intertwined. In order to determine whether the settlement is fair, the Court must first determine the amount of fees and expense reimbursement to which the former trustee may be entitled. As discussed below, the Court finds that the compensation awarded to Mr. Brandt under the settlement is reasonable, and that all requirements and findings necessary for awarding such compensation to Mr. Brandt under 11 U.S.C. § 330 are present in this case.

## A. *Lodestar*

■ Sections 330 and 326 of the Bankruptcy Code govern the award of fees to a bankruptcy trustee. Under § 330(a)(1)(A) a trustee is entitled to "reasonable compensation for actual, necessary services rendered..." A trustee's reasonable compensation for his actual and necessary services is typically determined by the lodestar method which multiplies the trustee's actual hours by a reasonable hourly rate for his services.

■ In reviewing a fee application, "the reviewing court need only correct reasonably discernible abuses, not pin down to the nearest dollar the precise fee." *Busy Beaver*, 19 F.3d at 845 (*citing Lindy Bros. Builders, Inc. v. American Radiator & Std. Sanitary Corp.*, 540 F.2d 102, 116 (3d Cir.1976)("[W]e 'do not intend that a ... court in setting a ... fee become enmeshed in a meticulous analysis of every detailed facet of the professional representation. It ...is not our intention that the inquiry into the adequacy of the fee assume massive proportions even dwarfing the case in chief.' ")).

■ The Brandt Fee Application discloses that Mr. Brandt and his staff worked 24,927 hours on behalf of the Estate at a blended rate of $205.99. While there have been objections to Mr. Brandt's entitlement to fees based upon the District Court's willful misconduct findings, there have been no objections to the calculation of the lodestar based upon either the hourly rate or the number of hours expended. The Court's review of the Brandt time sheets reveal that they are extremely detailed and descriptive. There are no duplicate entries or excessive time given the complexity of the matters handled. The Court reviewed each of Mr. Brandt's interim fee applications and found them to be reasonable. Based upon the Court's extensive experience with fee petitions, the rate of $205.99 is well within the range for reasonable professional fees in this district. It is difficult for the Court to assess the necessity of 25,000 total hours of work. The magnitude of the work involved is evident when one considers, for example, that the FDIC sequestered 88,000 boxes of documents when they seized SEBNA and SEBWF, the two Southeast banks. Bil-

lions of dollars of accounting entries and transactions were reviewed in the Receivership estates before the FDIC settlement could be reached. Yet the FDIC Litigation was only one of a large number of matters pursued by the former trustee to realize value for the Estate. There were many lawsuits in addition to the four dismissed cases previously discussed. In addition, Mr. Brandt and his staff worked to satisfy employee claims for pension benefits and health care reimbursement, as well as to liquidate all manner of non-banking subsidiary assets. The Court finds that 25,000 hours spent working on these matters is reasonable and not excessive given the complexity of this case, the six-year tenure of Mr. Brandt and his staff, and the outstanding results achieved. The blended rate multiplied by the number of hours produces a lodestar in the amount of $5,138,864, an amount previously approved by the Court on an interim basis. The Court notes that neither the Objecting Parties nor the U.S. Trustee objected to the calculation of the lodestar.

### B. *Exceptional Results In This Case Warrant A Fee Enhancement*

The reasonable compensation for actual, necessary services rendered by the trustee is subject to reduction or enhancement based on the considerations identified in § 330. The Court may also consider the factors enumerated in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974) and increase fees for "excellent or exceptional results." *Grant v. George Schumann Tire & Battery Co.*, 908

F.2d 874, 880 (11th Cir.1990); *Miniscribe Corp. v. Harris Trust Company*, 309 F.3d 1234, 1243 (10th Cir.2002). It is well established under the Johnson factors that an attorney's lodestar fee "may be enhanced based on risk of non-recovery, excellent or exceptional results, or delay in receipt of payment." *George Schumann*, 908 F.2d at 880 (*citing Norman v. Housing Authority of the City of Montgomery*, 836 F.2d 1292, 1302 (11th Cir.1988)). The same principle permits a bankruptcy court to enhance a trustee's fee based on achieving an exceptional result in the case. *Miniscribe*, 309 F.3d at 1243–45.[9] However, "[e]ven exceptional results do not warrant enhancement 'unless there is specific evidence in the record to show that the quality of representation was superior to that which one would reasonably expect in light of the rules claimed... Exceptional results are results that are out of the ordinary, unusual or rare.' " *George Schumann*, 908 F.2d at 880 (quoting *Norman*, 836 F.2d at 1302). The results achieved in this case are undeniably exceptional, and largely attributable to Mr. Brandt's experience, and superior stewardship of the Estate during his tenure as trustee. The fifth largest bank failure in the nation up to that point in time was transformed into an estate that paid 100 per cent of all allowed claims plus postpetition interest. The distributions from the Southeast Estate accounted for 30 percent of all distributions made in all Chapter 7 cases during the 1990's. The Court finds that the results achieved by Mr. Brandt in this case

---

9. These rules are subject to the overriding requirement that the trustee's fee cannot exceed the statutory cap set forth in section 326 of the Code. *In re Arius, Inc.*, 237 B.R. 843 (Bankr.M.D.Fla.1999). In this case, for practical purposes, the cap is three percent of monies "disbursed or turned over in the case by the trustee to parties in interest." The Brandt Fee Application states that cumula-

tively, the trustees have or will disburse $630,556,002. Thus at this point, as applied to this Estate, the statutory cap would result in a limitation of compensation to all trustees of $18,916,860. The award of compensation to Mr. Brandt taken together with all compensation awarded the other trustees may not exceed that amount.

were out of the ordinary, unusual and rare. A fee enhancement for Mr. Brandt is therefore appropriate.

 By directing courts to take into account *all* relevant factors, section 330(a) confers broad discretion upon bankruptcy courts when determining the amount of reasonable compensation. "At least, in part, the bankruptcy court's broad discretion is due to the fact that 'no matter how close the court comes to an objective determination of a reasonable fee, the fee determination is still in the final analysis, a substantially subjective enterprise.'" *Staiano v. Cain (In re Lan Assoc. XI, L.P.)*, 192 F.3d 109, 122 (3d Cir.1999)(quoting *In re Garland Corp.*, 8 B.R. 826, 831 (Bankr.D.Mass.1981)(omitting modifications of original)). Bankruptcy courts have the discretion to enhance trustee fees by applying a reasonable multiplier to the lodestar in exceptional cases. *Miniscribe*, 309 F.3d at 1244. In *Miniscribe*, the Tenth Circuit affirmed the bankruptcy judge's use of a 2.5 multiplier on the trustee's lodestar where the estate was insolvent and had little to pay creditors at the start of the case, the trustee managed litigation that produced a 50% distribution in the case, and the bankruptcy judge found these results to be exceptional.

 The trustee's recoveries in this case would justify an enhancement for the same reasons that the bankruptcy court approved a 2.5 multiplier in the *Miniscribe* case. When Mr. Brandt became trustee in April 1992 he suggested to various creditors that, based on the state of the case at the time, there might be a distribution of three to five percent in the case. The indenture trustee representatives criticized Mr. Brandt for making those observations because they believed there might not be a dividend, and they were concerned that Mr. Brandt's predictions would unreasonably inflate creditor expectations. These same creditors, who have been paid 100% of their allowed claims plus postpetition interest and attorneys' fees, now assert that the Court should deny all compensation to Mr. Brandt.

An enhancement of Mr. Brandt's fees is also appropriate by virtue of the fact that Mr. Brandt sacrificed his own personal interests in favor of the Estate's interests by declining to disclose Mr. Bainton's poor legal advice as a means of deflecting criticism of his conduct based on that legal advice. When Mr. Brandt later tried to explain his reliance on counsel's legal advice, Mr. Beck objected on the basis that Mr. Brandt could not waive the Estate's privilege. The resulting six-year delay in payment of Mr. Brandt's fees and the unwarranted criticism that he has endured are properly compensated by an enhancement.

 In addressing the Brandt Fee Application, the Court takes into consideration all of the facts surrounding his tenure as trustee, weighing "the good with the bad." *In re Granite Partners, L.P.*, 219 B.R. 22, 40–46 (Bankr.S.D.N.Y.1998) ("Before imposing a sanction [by way of fee reduction], the court must consider the value of the services performed and the degree of harm or prejudice to the estate;" recognizing that "weighing the good with the bad necessarily abjures a bright line approach," the court reduced trustee fees by five percent for "willful failure to disclose" the trustee's counsel's conflict of interest).

On the positive side, Mr. Brandt's aggressiveness and experience in litigating against the FDIC and with respect to other assets and claims administered under his supervision helped make this Chapter 7 case uniquely and exceptionally successful, with recoveries during Mr. Brandt's tenure of over $350 million.

On reversal of the dismissals, Mr. Beck settled the Directors Litigation for $9 million in cash and an approximate reduction of $18 million in claims. This reduction in claims is the equivalent of the Estate receiving an additional $18 million given that creditors received 100% payment on their claims. The Deloitte Action was settled for a cash payment of $4.95 million. Mr. Beck recovered $26 million in aggregate for the Ross & Hardies malpractice claim and settlement of the Steel Hector & Davis litigation. These matters were thus settled for a total value to the Estate of approximately $58 million.

The good significantly outweighs the bad for Mr. Brandt in this case; (i) the settlement with Ross & Hardies largely, if not entirely, offsets any harm to the Estate caused by Mr. Brandt's transgressions; (ii) although Mr. Brandt's reliance on counsel may not totally exonerate Mr. Brandt's violations, that reliance does significantly mitigate the misconduct; and (iii) Mr. Brandt's conduct in all instances was intended to benefit the Estate, not Mr. Brandt personally.

Absent the misconduct and given the truly exceptional results in this case, the Court would have awarded an enhancement to Mr. Brandt applying a multiplier of 2.0 to lodestar or $10,277,728 in total fees. However Mr. Brandt's misconduct, although mitigated by his reliance on legal advice of counsel, must be considered. Accordingly, if the Court were ruling solely on the Brandt Fee Application, the Court would reduce the enhancement by using a smaller 1.8 multiplier applied to lodestar [10] for a total fee award to Mr. Brandt of $9,249,955, said amount to include interim fee awards already paid.

**10.** The settlement in effect applies approximately a 1.5 multiplier to Mr. Brandt's lodestar.

### C. *Entitlement To Litigation Expenses*

Section 330 (a)(1)(B) of the Bankruptcy Code permits "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(2)(B). "Expenses are deemed necessary if they are incurred because they were properly required to accomplish the task for which the professional was employed." 3 Collier on Bankr. ¶ 330.06[1] (15th ed.1999). "In allowing expenses to be paid from the estate, the court must consider whether the expenses benefited the estate." *In re Cal Farm Supply Co.*, 110 B.R. 461, 463 (Bankr. E.D.Cal.1989).

The Brandt Fee Application does not evidence a sufficient basis for the Court to find that the $2.3 million in litigation expenses Mr. Brandt incurred defending his actions as trustee were necessary to, or benefited, the Estate. Consequently, if the Court were ruling solely on the Brandt Fee Application, the Court would deny without prejudice Mr. Brandt's request for reimbursement of litigation expenses incurred defending his actions as trustee in the approximate amount of $2.3 million on the basis that the record has not been adequately developed.

### II. *The Settlement Motion*

Bankruptcy Rule 9019 provides that after conducting a hearing on notice to creditors, the Court may approve a compromise or settlement. "It has long been the law that approval of a settlement in a bankruptcy proceeding is within the sound discretion of the court, and will not be disturbed or modified on appeal unless approval or disapproval is an abuse of discretion." *In re Arrow Air*, 85 B.R. 886,

890–891 (Bankr.S.D.Fla.1988) (citations omitted).

The former Fifth Circuit concluded that the overarching consideration in ruling on a settlement is whether the settlement is "fair and equitable" and "in the best interest of the estate." *Rivercity v. Herpel (In re Jackson Brewing)*, 624 F.2d 599, 602 (5th Cir.1980).

 In evaluating a proposed settlement, the Court must make an informed, independent judgment that the compromise is fair and equitable. The judgment thus requires consideration of "all facts necessary [to form] an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated." *Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). "A trial of 'mini-trial' on the merits is not required for court approval of a settlement. The court's responsibility is to canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'"[11] *Official Comm. of Unsecured Creditors of Int'l Dist. Centers, Inc. v. James Talcott, Inc. (In re Int'l Dist. Centers, Inc.)*, 103 B.R. 420, 423 (S.D.N.Y.1989) (quoting *In re W.T. Grant*, 699 F.2d 599, 608 (2nd Cir. 1983), and *In re Teltronics Services*, 762 F.2d 185, 189 (2nd Cir.1985)). *Accord, Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir.1990) (determining that a bankruptcy judge does not have "to *decide* the merits of the claims" being resolved by a settlement—"only the *probability* of succeeding on those claims.")(emphasis in original); *Official Committee Of Unsecured Creditors v. Cajun Electric Power Cooperative, Inc. (In re Cajun Electric)*, 119 F.3d 349, 356 (5th Cir.1997). Thus, in ruling on the Settlement Motion, the Court does not now decide the ultimate factual and legal issues underlying the settled disputes.

 The Court must consider four factors in deciding whether to approve the proposed settlement: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *Justice Oaks*, 898 F.2d at 1549.

 The first *Justice Oaks* factor—Mr. Beck's probability of success in litigating the Brandt Disputes—weighs in favor of the settlement. By its June 14, 2004 orders, the Court rejected two of the principal arguments advanced against the Brandt Fee Application. The Court ruled that the District Court's willful misconduct findings did not preclude a fee award to Mr. Brandt as a matter of law. The Court also ruled that the doctrines of collateral estoppel and law of the case did not preclude the Court from revisiting the District Court's willful misconduct findings in the Directors Litigation insofar as they impact Mr. Brandt's entitlement to fees.[12] Hav-

---

11. The *Teltronics* articulation is based on cases in which the Estate is the claimant, i.e., where the Estate would collect from others. In this case, the Estate is a respondent to the Brandt Fee Application. In this context, *Teltronics* calls for approving the settlement unless the Court finds the settlement falls *above* the *highest* point in the range of reasonableness.

12. Even if collateral estoppel and law of the case *were* applicable to these proceedings, the Court would nevertheless have allowed Mr. Brandt to introduce evidence to mitigate and place in context his actions that led to the

ing already rejected two of the principal arguments against the Brandt Fee Application, the Court's evaluation is that the probability of success in litigating the Estate's claims against Mr. Brandt is quite low. Moreover, Mr. Beck's testimony reveals that the Estate has already been compensated for any alleged damage caused by Mr. Brandt's misconduct.

In addition, "[t]he Court can give weight to the Trustee's informed judgment that a compromise is fair and equitable." *In re Raytech Corp.*, 261 B.R. 350, 360 (Bankr.D.Conn.2001). Mr. Beck is well informed regarding the relative merits of the Brandt Disputes, as shown by the mediation statements and Mr. Beck's testimony. Mr. Beck's informed judgment, that Mr. Brandt generally would have prevailed on the Estate's claims against him and that the proposed settlement is fair and equitable to the Estate, is consistent with the Court's evaluation.

*Justice Oaks'* second factor, collectibility, is not relevant here.

*Justice Oaks'* third factor is complexity, including attendant expense and delay. The evidence shows that the Brandt Disputes presented myriad factual and legal issues with regard to both liability and damages on a number of different claims and defenses. These issues would be expensive to litigate, perhaps in excess of $1 million, and the litigation would last several years.

*Justice Oaks'* fourth factor is "the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *Justice Oaks*, 898 F.2d at 1549. Pursuant to *Justice Oaks*, only "reasonable" creditor views are entitled to such deference. Mr. Beck testified without rebuttal that the consistent view expressed to him by certain of the Objecting Parties about settlement was that Mr. Brandt should be paid no fees, and that he should be required to disgorge all of his interim fee awards. Based on the results obtained by Mr. Brandt during six years of service as trustee in this case, the Court finds that this view is not reasonable.

The circuit courts have consistently held that creditor views are but *one* of the factors to consider in approving a settlement, and are not controlling. *See, e.g., LaSalle Nat'l Bank v. Holland (In re American Reserve)*, 841 F.2d 159, 161–162 (7th Cir.1987) ("The bankruptcy judge should also consider the creditors' objections to the settlement; however, the creditors' views are not controlling").[13]

willful misconduct findings. This evidence, which includes Mr. Brandt's reliance on legal advice of counsel, is necessary for the Court to make an informed decision on how much trustee fees to award Mr. Brandt based on all of the circumstances. *In re Granite Partners*, 219 B.R. at 40–46.

13. *See also, Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1382 (9th Cir. 1986) (creditors' "objections are not controlling, and while the court must preserve the rights of the creditors, it must also weigh certain factors to determine whether the compromise is in the best interest of the bankrupt estate."); *Davis v. Jackson (In re Transcontinental Energy Corp.)*, 764 F.2d 1296, 1299 (9th Cir.1985) ("It is well settled that the bankruptcy court and the trustee should carefully consider the wishes of a majority of the creditors, but that those wishes are not binding.") (citing 2A *Collier on Bankruptcy*, ¶ 27.04, at 1090–92."); *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp.,(In re Foster Mortgage)*, 68 F.3d 914, 919 (5th Cir.1995) ("We are careful to add that we are creating no per se rule allowing a majority of creditors in interest to veto a settlement. This Court merely states that for failing to consider the overwhelming opposition to the settlement and the familial relationship between Foster and United, the bankruptcy court abused its discretion by accepting the settlement."); and *Official Committee of Unsecured Creditors v. Cajun Electric Power Coop., Inc. (In re Cajun Electric)*, 119 F.3d 349, 358 (5th Cir.1997) ("it

Mr. Beck testified that before and after the mediation, he and special counsel shared the mediation statements and consulted extensively with the Objecting Parties prior to agreeing to settle the Brandt Disputes. Despite the consultations and disclosures, Mr. Beck testified that in his professional opinion the Objecting Parties' position that disgorgement was required remained outside the range of likely outcomes. The Court agrees, but has nevertheless considered the views expressed by the Objecting Parties in determining the reasonableness of the settlement.

Having presided over this case since October 1993, the Court is very familiar with the conduct of the current and former trustees, and the Objecting Parties. The Objecting Parties have received 100% payment on their claims as well as postpetition interest. Their position, that Mr. Brandt is not entitled to any compensation, is unreasonable given that the bondholders would probably not have been made whole were it not for Mr. Brandt's successful recoveries on behalf of the Estate's creditors. Were the Court to sustain the Objections, the additional distributions made possible by denial of reasonable compensation to Mr. Brandt would provide an undeserved windfall to the Objecting Parties.

The proposed settlement calls for the payment of $7,632,904 in total trustee fees to Mr. Brandt and final approval of the $230,213 in interim expenses previously paid to him. Based on the foregoing findings and conclusions, the Court determines (i) that the settlement proposed by Mr. Beck fairly and comprehensively takes into account the compensation allowable to Mr. Brandt for his services as trustee, as well as any damages sustained by the Estate as a result of Mr. Brandt's transgressions, is well within the range of reasonableness, and should be approved, (ii) that a final

award of compensation to Mr. Brandt of $7,632,904, including the interim payments previously made, for the actual and necessary services rendered as trustee, is fair and reasonable given the overall circumstances, and (iii) that the foregoing award reflects a reduction of more than $1.6 million from the compensation to which the Court determined Mr. Brandt would otherwise have been entitled had the settlement not been reached. The Court finds the settlement more than adequately compensates the Estate for any damages sustained as a result of Mr. Brandt's transgressions and for which the Estate has not otherwise been compensated. Further, the Court concludes, in light of the lack of any objection and upon review, that the $230,213 in expenses previously paid to Mr. Brandt on an interim basis represents reasonable and necessary expenses incurred in performance of his duties as trustee.

### CONCLUSION

The Court considered both the Brandt Fee Application and the Settlement Motion. The Settlement Motion resolves the Brandt Disputes including Mr. Brandt's fees. Because the proposed settlement is intertwined with the fee application, the Court first made an independent review of the Brandt Fee Application. The Court determined that Mr. Brandt was entitled to $9,249,955 in total fees including interim awards already paid, and final approval of $230,213 in expenses that have already been paid on an interim basis. The proposed settlement provides for payment of approximately $1.6 million less than the Court would have awarded Mr. Brandt for total reasonable fees for his services as trustee of the Southeast Estate. Accordingly, the settlement does not fall above

is established that the 'desires of the creditors are not binding' ") (citations omitted).

the highest point in the range of reasonableness.

The Court apprised itself of sufficient facts to determine that the Settlement Agreement is fair and equitable and in the best interest of the Estate. After consideration of the probability of success of the litigation, the complexity, expense and delay that would be caused by the litigation, and the interest of the creditors giving proper deference to their reasonable views in light of the 100% dividend plus post-petition interest that they have already received, the Court grants the motion to approve the proposed settlement and overrules the objections thereto.

### ORDER

Based upon the foregoing, it is hereby **ORDERED AND ADJUDGED** that:

1. Trustee Beck's Motion for Approval Of Settlement and Compromise of All Disputes with William A. Brandt, Jr. and Award of Final Compensation for Services of Trustee is **GRANTED**. The Objections are **OVERRULED**.

2. The Settlement Agreement is hereby **APPROVED** in its entirety, and upon the occurrence of the Effective Date, Trustee Beck is authorized and directed to comply with its terms and conditions.

3. The payments to William A. Brandt, Jr. under Section 3 of the Settlement Agreement are **APPROVED** under Bankruptcy Code section 330(a) as reasonable compensation for the actual, necessary services rendered by William A. Brandt, Jr. in his capacity as trustee, and reimbursement for actual, necessary expenses incurred in connection therewith. In making this determination, the Court has not allowed compensation for unnecessary duplication of services or services that were not reasonably likely to benefit the Debt-

or's estate or that were not necessary to the administration of the case.

4. William A. Brandt, Jr. is discharged from his duties as Southeast trustee and released from any liability for serving as trustee; and his wholly owned corporation, Development Specialists, Inc. is discharged from its responsibilities as consultant to former trustee Brandt and released of any liability for acting in that capacity in this case.

5. All bankruptcy trustee bonds furnished by William A. Brandt, Jr. in his capacity as former Chapter 7 trustee of Southeast Banking Corporation, as required by 11 U.S.C. § 322, be and they are hereby released and discharged and the sureties, as well as their successors and assigns, are hereby fully, finally and unconditionally released from any and all liability in connection with the bonds. Those bonds include the following:

Bankruptcy Trustee Bond, dated May 26, 1992, issued by Fidelity and Deposit Company of Maryland, as surety, with William A. Brand, Jr., as principal, in the amount of $50,000,000.00;

Bankruptcy Trustee Bond, dated April 15, 1993, issued by Fidelity and Deposit Company of Maryland, as surety, with William A. Brandt, Jr., as principal, in the amount of $22,000,000.00 and the rider thereto, dated July 24, 1995 reducing the amount of the bond to $8,936,000.00;

Bankruptcy Trustee Bond, dated July 19, 1994, issued by the sureties and the amounts indicated below, with William A. Brandt, Jr., as principal, in the total amount of $175,000,000.00:

| Surety | Limit of Liability |
|---|---|
| Fidelity & Deposit Co. of Md | $18,860,000.00 |
| Nat. Union Fire Ins. Co. of Pitts., Pa. | 13,860,000.00 |
| Signet Star Reins. Co. | 7,500,000.00 |
| The Home Ins. Co. | 5,000,000.00 |

| | |
|---|---|
| United State Fid. & Guar. Co. | 50,000,000.00 |
| American Ins. Co. | 9,992,500.00 |
| Fireman's Ins. Co. of Newark, NJ | 10,000,000.00 |
| Continental Cas. Co. | 13,860,000.00 |
| Seaboard Surety Co. | 25,000,000.00 |
| Reliance Ins. Co. | 20,927,500.00 |

The rider thereto, effective July 20, 1994, deleting Signet Star Reins. Co. as a surety and increasing the limit of liability of Continental Cas. Co. to $21,360,000.00 and, also, the rider thereto dated July 24, 1995, reducing the amount of the bond to $71,064,000.00;

Bankruptcy Trustee Bond, dated July 29, 1994, issued by Fidelity and Deposit Company of Maryland as surety, with William A. Brandt, Jr., as principal, in the amount of $1,000,000.00 and, also, the rider thereto effective August 1, 1996 reducing the amount of the bond to $300,000.00;

Bankruptcy Trustee Bond, dated December 28, 1996, issued by Continental Casualty Company, as surety, with William A. Brandt, Jr., as principal, in the amount of $17,500,000.00;

Bankruptcy Trustee Bond, dated July 19, 1997, issued by Continental Casualty Company, as surety, with William A. Brandt, Jr., as principal, in the amount of $97,500,000.00 and the rider, effective July 19, 1997, adding National Union Fire Insurance Company of Pittsburgh, PA, as co-surety for fifty percent of the bond amount.

6. The Court reserves jurisdiction to construe, interpret and enforce the terms of this Order and the terms and conditions of the settlement.