UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-30985
_____


THE CAJUN ELECTRIC POWER COOPERATIVE, INC.,

                              Debtor.

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

                              Appellant,

                    versus

     CAJUN ELECTRIC POWER COOPERATIVE, INC., BY AND THROUGH ITS
CHAPTER 11 TRUSTEE, RALPH R. MABEY; ENTERGY GULF STATES, INC.;
ENTERGY CORPORATION; UNITED STATES DEPARTMENT OF AGRICULTURE, ON
BEHALF OF RURAL UTILITIES SERVICE,

                              Appellees.

_____

        Appeal from the United States District Court for the
                    Middle District of Louisiana
_____

                      August 5, 1997

Before SMITH, BARKSDALE, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

     Cajun Electric Power Cooperative, Inc. ("Cajun") is a non-
profit rural electrical power cooperative that made an imprudent
investment in a nuclear power plant and is now a Chapter 11 debtor.
In this bankruptcy appeal, a committee representing more than 500
unsecured trade creditors asserting claims of approximately $7
million objects to the settlement of litigation between Cajun and

its two largest creditors. The district court, having withdrawn the reference to the bankruptcy court in order to superintend the case directly, approved the settlement.

Cajun's largest creditor is the federal government's Rural Utilities Service ("RUS") (formerly the Rural Electrification Administration), which provided Cajun with loans and loan guarantees for its investment in the River Bend nuclear plant. RUS asserts that it has secured claims against Cajun of $4.2 billion. Cajun's second-largest creditor is the nuclear plant's builder and principal owner, Gulf States Utilities Co. ("Gulf States"), which through its corporate successor, Entergy Gulf States, Inc., asserts unsecured claims of $400 million. The settlement was agreed to by Cajun's Chapter 11 trustee, Ralph R. Mabey.

The settlement approved by the district court would end the litigation between Cajun, RUS, and Gulf States relating to the River Bend plant. It also would resolve several other claims. In the view of the district court, the settlement would clear the way for approval of a plan of reorganization for the debtor, Cajun.

In the instant appeal, the trade creditors disavow any intention of preventing a settlement of the underlying litigation. They claim, however, that the settlement is flawed and should be "modified." They ask this court to order that the settlement be made contingent upon approval of a reorganization plan, or, alternatively, to equitably subordinate the claims of Gulf States and RUS.

In support of these requests, appellants advance two distinct

2

legal theories.  First, they contend that the settlement approved by the district court is an impermissible *sub rosa* reorganization plan.  Alternatively, they contend that the settlement is not fair and equitable.

We affirm the district court order approving the settlement. Consequently, we need not address whether the unusual relief sought by the Committee is appropriately addressed to this court.[1]

**FACTUAL AND PROCEDURAL BACKGROUND**

Cajun and Gulf States were bitter rivals who in 1980 united in a common endeavor: construction of the River Bend nuclear reactor. Cajun invested $588 million in River Bend in exchange for a 30 percent ownership stake.  RUS lent Cajun a substantial amount of capital for its investment in River Bend and guaranteed the remainder of Cajun's River Bend loans.

When River Bend turned out to be a financial drain, Cajun attempted to remain solvent by raising its rates.  This course was disallowed by the Louisiana Public Service Commission on the ground that River Bend was an imprudent investment.  On December 21, 1994, Cajun filed for protection from its creditors under Chapter 11.

---

[1]As discussed below, this court has the authority to set aside the order approving the settlement if we find that it was an abuse of the district court's discretion.  That is not the relief sought by the Committee, however.  The Committee asks this court to order that up to $7 million in unsecured trade creditors' claims be paid in full as part of any reorganization plan incorporating the settlement.

Appellees contend that this relief is unauthorized by the Bankruptcy Code, and if granted, would amount to a *sub rosa* reorganization plan.  They further contend that such a ruling would amount to an order equitably subordinating the claims of Gulf States and RUS, without the benefit of a trial in district court.

It is unnecessary to recount the entire history of Cajun's Chapter 11 proceedings. We need only provide a brief summary of the settlement agreement approved by the district court.

If the settlement is affirmed, Cajun first and foremost would be freed of any future involvement in River Bend. Cajun would be obligated, however, to pay $107 million toward its share of the reactor's decommissioning trust fund. Cajun would be absolved of any further liability for the plant's decommissioning, but would be barred from recovering any excess if the decommissioning fund proves to be overfunded.

Cajun, unshackled from its River Bend investment, would drop its suit against Gulf States seeking (1) rescission of the River Bend agreement on grounds of fraud and error; or, in the alternative, (2) damages for breach of contract, breach of fiduciary duty, and mismanagement. A four-month trial was held in district court on the fraud suit; it ended with the district court ruling in Gulf States' favor, although a final written opinion has not issued. The breach of contract suit has not yet gone to trial; the trustee has estimated that Cajun might recover $200 million in damages.

The parties would relinquish several additional claims against one another, including:

! Claims and counter-claims relating to Gulf States' transmission of Cajun power (the "Transmission Services" suit). Based on a ruling favoring Gulf States by the Federal Energy Regulatory Commission ("FERC"), the settling parties estimate that

4

Cajun could be required to pay $55 million in counter-claim damages if this suit runs its course.

! A dispute over Cajun's unilateral decision to cease payments to Gulf States on certain River Bend expenses (the "Service Water" suit). Gulf States has obtained a preliminary injunction allowing it to deduct the money withheld by Cajun, $58 million, from Gulf States' payments to Cajun for electricity generated by Cajun's coal-burning plant. The $58 million has been deposited in district court; under the settlement, Gulf States would keep it.

! Cajun's claim against Gulf States and RUS for equitable subordination.[2]

! Claims between Cajun and RUS arising from River Bend, including Cajun's claims for lender liability and waiver of deficiency judgment. Cajun retains the right to claim that RUS did not perfect its security interest.

! Cajun transfers two transmission lines worth $20 million to Gulf States, which agrees to transmit Cajun power through its lines.

Also under the settlement, RUS succeeds to Cajun's interest in River Bend. RUS can keep this "asset," sell it, or force Gulf States to take it. In the unlikely event that the plant is sold to a third party, Cajun will deduct the sale price from its debt to

---

[2]A trustee in bankruptcy has standing to bring an equitable subordination claim on behalf of the bankrupt estate's creditors. *See Fruehauf Corp. v. T.E. Mercer Trucking Co. (In re T.E. Mercer Trucking Co.)*, 16 B.R. 176, 187 (Bankr. N.D. Tex. 1981); *First Bank Billings v. Feterl Mfg. Co. (In re Parker Montana Co.)* 47 B.R. 419, 421 (D. Mont. 1985).

5

RUS. The eventual owner of Cajun's interest in River Bend would receive any proceeds from litigation over design defects, estimated by the trustee to be about $10 million.

The Committee representing the trade creditors did not ask the district court to reject the Agreement. Instead, the Committee requested that the court defer approval until confirmation of a bankruptcy plan, or, in the alternative, approve the settlement conditionally, pending confirmation of a plan. The district court denied these requests and approved the settlement on August 27, 1996. The Committee appeals.

## DISCUSSION

### I. JURISDICTION

Because the district court did not sit as a bankruptcy appeals court but heard the case itself as a court of bankruptcy, 28 U.S.C. 158(d) does not confer appellate jurisdiction on this court. Instead, our jurisdiction is governed by 28 U.S.C. § 1291. *Cajun Elec. Power Coop., Inc. v. Central Louisiana Elec. Co. (In re Cajun Elec. Power Coop., Inc.*), 69 F.3d 746 (5th Cir. 1995), *modified on other grounds on reh'g*, 74 F.3d 599 (5th Cir.) (per curiam)(authorizing appointment of trustee in the instant case), *cert. denied*, ---U.S.---, 117 S.Ct. 51, 136 L.Ed.2d 15 (1996).

Section 1291 vests the federal courts of appeals with "jurisdiction of appeals from all final decisions of the district courts . . . ." Appellate jurisdiction under this statute ordinarily "depends on the existence of a decision by the District Court that 'ends the litigation on the merits and leaves nothing

6

for the court to do but execute the judgment.'" *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). However, it is settled in this circuit that in the bankruptcy context, the liberalized final judgment rule of 28 U.S.C. § 158(d) applies, even when appellate jurisdiction is based on section 1291. *Cajun*, 69 F.3d at 748. Under this rule, jurisdiction exists if there is an order finally disposing of some, but not necessarily all, of the claims.

The district court's approval of the settlement order brings to an end the protracted litigation over the River Bend nuclear project and various other claims among Cajun, Gulf States, and RUS. It is "final" as the term is understood in bankruptcy. Accordingly, we have jurisdiction under 28 U.S.C. § 1291.

## II. *SUB ROSA* REORGANIZATION

We review *de novo* the district court's legal conclusion that the settlement does not effect a *sub rosa* plan of reorganization. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1307 (5th Cir. 1985). Related factual findings are reviewed for clear error. *See id.* at 1308.

A bankruptcy trustee is authorized by statute to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Under the Bankruptcy Rules, a trustee is permitted to settle lawsuits pursuant to section 363(b). FED. BANKR. R. 9019(a). However, section 363(b) does not authorize the trustee to enter a settlement if the result amounts

7

to a *sub rosa* plan of reorganization.  As we have stated:

> The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of a plan sub rosa in connection with a sale of assets.

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc.* (*In re Braniff Airways, Inc.*), 700 F.2d 935, 940 (5th Cir. 1983).  On the other hand, "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (internal quotation marks and citations omitted).

The Committee asserts that the instant settlement effectively gutted the assets of the estate without affording the unsecured trade creditors the procedural protections of the reorganization process.  Specifically, the Committee contends that the settlement, by removing more than $100 million from the estate and by eliminating the estate's equitable subordination claims against RUS and Gulf States, effectively dictates the terms of any future reorganization plan--an outcome proscribed by our cases.  Appellees counter that far from being a *sub rosa* reorganization plan, the settlement removes a major obstacle to reorganization by ridding Cajun of its involvement in River Bend.  They point out that the nuclear plant and related litigation had clouded title to Cajun's other assets, precluding any sale of those assets prior to a settlement.

Appellees make a strong argument that the Committee failed to

preserve this issue for appeal by stating precisely the Chapter 11 protections that they would lose under the settlement. However, even assuming that the Committee preserved the issue, we reject its claim on the merits.[3]

The legal standard for deciding whether a transaction under section 363(b) amounts to a *sub rosa* reorganization emerges from our case law. In the *Braniff* case, this court reversed the district court's approval of a transaction that would have transferred the bankrupt airline's cash, aircraft and equipment, and terminal leases to another airline (the purchaser) in exchange for scrip for travel on the purchaser.

We found the transaction deficient on three grounds. First, the agreement "had the practical effect of dictating some of the terms of any future reorganization plan." *Braniff*, 700 F.2d at 940. That is because, had a reorganization plan failed to restrict the use of the travel scrip as specified in the agreement, the scrip would have been forfeited. *Id.* Second, the agreement required Braniff's secured creditors to vote "in favor of any future reorganization plan approved by a majority of the unsecured creditors committee." *Id.* The secured creditors' voting rights were thus infringed. Finally, the transaction "provided for the release of claims by *all parties* against Braniff, its secured

---

[3]In its reply brief, the Committee cites portions of the district court record in which it listed various procedural protections afforded by Chapter 11, such as the right to a disclosure statement providing adequate information about any proposed plan. Missing from this recitation is any indication of how the Committee might lose these protections if the settlement is approved.

9

creditors, and its officers and directors." *Id.* (emphasis added). Had the sale of Braniff's assets been approved, we concluded, "little would remain" in the estate and there would be "little prospect or occasion for further reorganization." *Id.*

The instant settlement is not a *sub rosa* reorganization of the type disapproved in *Braniff*. It does not dispose of all claims against Cajun, nor does it restrict creditors' right to vote as they deem fit on a proposed reorganization plan. Finally, the settlement does not dispose of virtually all of Cajun's assets, leaving "little prospect or occasion for further reorganization." *Cf. Braniff*, 700 F.2d at 940. Instead it disposes of one particular "asset," River Bend, which is not so much the crown jewel of Cajun's estate but its white elephant. *Cf. Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985) (recognizing that the disposal of a crown jewel asset might, in some circumstances, amount to a *sub rosa* plan). The removal of River Bend from the estate will facilitate Cajun's reorganization, and will do so without denigrating the rights of the unsecured trade creditors.

Undeniably, the settlement removes $107 million in cash and transmission lines worth $20 million from the debtor's estate; it also precludes Cajun from pursuing litigation--an uncertain prospect at best--against Gulf States and RUS.[4] However, Cajun retains as much as $1.1 billion in non-River Bend assets. In sum,

---

[4]As noted above, Cajun retains the right to pursue certain claims against RUS, including the claim that its security interest was not perfected.

the settlement does not "alter creditors' rights, dispose of assets, and release claims to the extent proposed in the wide-ranging transaction disapproved in" *Braniff*. *Richmond Leasing*, 762 F.2d at 1303. The cases are entirely distinguishable, and the settlement at issue does not effect a *sub rosa* plan.

III. FAIR AND EQUITABLE SETTLEMENT

The Committee argues in the alternative that the settlement violates the "fair and equitable" standard and that the district court erred by approving it without conditioning the settlement on approval of a reorganization plan.

We review the district court's decision to approve the settlement for an abuse of discretion. *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995) (internal citations omitted). Subsidiary factual findings are reviewed for clear error. *Id.*

As noted above, the courts are empowered to approve a compromise settlement of a debtor's claim under Bankruptcy Rule 9019(a). *See id.* Approval should only be given if the settlement is "fair and equitable and in the best interest of the estate." *Id.* (citing *In re Jackson Brewing Co.*, 624 F.2d at 602 (additional citations omitted)). The "fair and equitable standard" is not as vague as it might appear to be. "The words 'fair and equitable' are terms of art--they mean that senior interests are entitled to full priority over junior ones." *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir.) (internal quotation marks and citations omitted), *cert. denied*, 469 U.S. 880, 105 S.Ct.

11

244, 83 L.Ed.2d 182 (1984).

In deciding whether a settlement of litigation is fair and equitable, a judge in bankruptcy must make a well-informed decision, "compar[ing] the terms of the compromise with the likely rewards of litigation." *Jackson Brewing Co.*, 624 F.2d at 602 (internal quotation marks and citation omitted). In particular:

> [The judge] must evaluate and set forth in a comprehensible fashion:
> (1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law,
> (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and
> (3) All other factors bearing on the wisdom of the compromise.

*Id.* (internal citation omitted).

With respect to the first factor, it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement. "The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision . . . ." *La Salle Nat'l Bank v. Holland (In re American Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir. 1987).[5]

Under the rubric of the third, catch-all provision, we have specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider the best interests of the creditors, "with proper deference to their reasonable views." *Foster Mortgage Corp.*, 68 F.3d at 917. Second, the court should consider "the extent to which the

---

[5]In this case, the district court had already tried a four-month trial on the rescission claim and was more than familiar with the applicable facts and law.

12

settlement is truly the product of arms-length bargaining, and not of fraud or collusion. *Id.* at 918 (internal citations omitted).

Applying this standard to the facts of the instant case, we conclude that the district court did not abuse its discretion by approving the settlement. We consider each factor in turn.

*Probability of Success in Litigation*. The settlement requires Cajun to abandon several claims against Gulf States and RUS. None of these actions look particularly promising from our vantage point, and more important, none impressed the district court.

Under the agreement, Cajun would drop its suit against Gulf States for rescission of the River Bend joint ownership agreement. The probability of Cajun's succeeding in this action is close to nil, inasmuch as Cajun has already lost after a four-month trial in district court. Moreover, the district court, which is excruciatingly familiar with the details of this case, found that Cajun had little chance of succeeding in the companion action seeking damages for breach of contract and breach of fiduciary duty.

The settlement also would require Cajun to drop the Transmission Services suit. This action has boomeranged against Cajun, resulting in a judgment of $55 million against it on Gulf States' counter-claim.

Cajun would be forced to drop the Service Water suit as well. In that action, Gulf States has obtained an injunction effectively denying Cajun the right to withhold payment for various River Bend expenses. Cajun does not seem to be giving up anything of value by

13

waiving its right to pursue these actions.

Perhaps most important to the Committee, Cajun would be required to surrender any claim of equitable subordination against Gulf States and RUS. These claims too are unlikely to succeed, for the reasons that follow.

The Bankruptcy Code provides that "after notice and a hearing, the court may--(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . . ." 11 U.S.C. § 510(c). Equitable subordination is remedial in nature and is only rarely granted. *United States Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re United States Abatement Corp.)*, 39 F.3d 556, 561 (5th Cir. 1994).

The Bankruptcy Code does not specify the circumstances in which equitable subordination is appropriate. Instead, drawing on common law principles, this circuit has crafted a widely followed standard authorizing equitable subordination if three preconditions are satisfied. Under this test, equitable subordination is permitted when (1) the claimant engaged in inequitable conduct; (2) the conduct resulted in harm to the creditors or conferred an unfair advantage upon the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code. *United States Abatement* Corp., 39 F.3d at 561 (citing *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir. 1991)); *see also Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977)

14

(additional citations omitted). As a practical matter, we generally have found equitable subordination in only three typical cases: "(1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors." *United States Abatement* Corp., 39 F.3d at 561 (internal citations omitted).

The settlement would force Cajun to relinquish claims of equitable subordination against Gulf States and RUS. The only conceivable bases for these claims are (1) that Gulf States breached a fiduciary duty to Cajun, and (2) that RUS controlled Cajun to the trade creditors' disadvantage. However, Cajun has failed to present a persuasive argument as to why Gulf States owed it a fiduciary duty, let alone as to how Gulf States breached that duty. Moreover, the theory that Cajun was controlled by RUS is far-fetched.

The typical case of equitable subordination based on creditor control of the debtor involves a corporate insider. *See, e.g., Fabricators*, 926 F.2d at 1465-66. On occasion, bankruptcy courts have found that a creditor exerted such dominance over the debtor as to warrant subordination of the creditor's claims. However, the degree of control in such cases far exceeds the influence of RUS over Cajun, and is typically related to some egregious misconduct by the creditor. *See, e.g., In re American Lumber Co.*, 5 B.R. 470, 478-79 (D. Minn. 1980) (creditor deprived borrower of its sole

15

source of cash, forced it to adopt austerity measures, decided which creditors would be paid, and required debtor to provide secured interest in all remaining assets); *Slefco v. First Nat'l Bank of Stuttgart (In re Slefco)*, 107 B.R. 628 (Bankr. E.D. Ark. 1989) (bank made false representations to debtor about amount of loan and ability to borrow in the future, leading debtor to pledge all its assets to the bank); *Bank of New Richmond v. Production Credit Ass'n of River Falls (In re Osborne)*, 42 B.R. 988 (W.D. Wis. 1984) (affirming subordination based on affirmative misrepresentation to another creditor). In this case, by contrast, Cajun does not even bother to allege that RUS engaged in inequitable conduct. Nor does Cajun explain how RUS, an arm of the government with no authority to actually take over and run the company, can rationally be viewed as its alter ego.

In sum, Cajun's prospects in the courtroom, on the equitable subordination claims as in its other lawsuits, are iffy at best. More likely, they are dismal. Our review of Cajun's likelihood of success in litigation does not support the Committee's assertion that the settlement should be modified.

*Complexity and Expense of Litigation.* We need not belabor this factor. According to the trustee, the litigation has cost Cajun $37 million to date, and continuing the litigation would cost "millions of dollars and years of delay." The district court has repeatedly commented upon the complexity of the legal issues raised. The fraud trial in district court took four months; the breach of contract trial would consume an estimated seven to

16

fourteen months. Moreover, the district court found that continuing the litigation would waste the estate's resources and chill efforts to acquire Cajun's non-nuclear assets. These findings were not clearly erroneous.

Given the complexity and cost of the litigation, settlement is advisable.

*The Best Interests and Wishes of the Creditors*. The trustee testified, and the district court found, that Cajun's ownership interest in River Bend was a major impediment to reorganization. The district court also determined that the settlement would remove this obstacle without altering the creditors' rights under the Code. The court thus concluded that the settlement was in the creditors' interests. None of these findings were clear error.

The issue is complicated somewhat by the requirement that the court, in considering whether a settlement is fair and equitable, consider the reasonable views of a majority of the creditors. *In re Foster Mortgage Corp.*, 68 F.3d at 917. In this case, the vast numerical majority of creditors is represented by the Committee, which opposes the settlement as approved by the district court.[6] The appellees point out, however, that the trade creditors' aggregate claim against Cajun is only a drop in the bucket--by some estimates less than one percent of Cajun's total debt.

Even if we were to count heads and declare that a majority opposes the settlement, it is established that the "desires of the

---

[6]The Committee contends that it would not oppose the settlement, if only it were conditioned on approval of a plan that protected their interests.

17

creditors are not binding." *In re Foster*, 68 F.3d at 917. The test is not the desires of the majority as such, but the best interests of the creditors, taking into account their reasonable views. In this case there is room to argue about who speaks for the "majority." But given the salutary effects of a settlement on the prospects for reorganization, and given also the relatively small amount of the trade creditors' claims, the district court did not clearly err by finding the settlement in the creditors' interests. In any event, given that all of the other factors in the equation overwhelmingly favor the settlement, the wishes of the trade creditors do not compel us to reject the settlement.

*Arms-Length Negotiations.* The Committee does not contest the district court's determination that the settlement was the result of arms-length bargaining, and not the result of fraud or collusion.

Based on the foregoing factors, we hold that the district court did not abuse its discretion by finding that the settlement was fair and equitable.[7] Cajun's prospects in the litigation are dubious; the cost and complexity of the litigation are staggering. The settlement was the result of arms-length bargaining. And although a numerical majority of creditors opposes the settlement,

---

[7]The district court cited public safety as one more factor favoring the settlement. We do not doubt that the public interest will be served by a settlement that resolves a dispute over River Bend's decommissioning trust fund, thus assuring the availability of funds for the safe decommissioning of the nuclear plant. However, we do not rely on this factor and need not decide whether public safety is an appropriate consideration in determining whether a settlement is fair and equitable.

18

the overall interests of the creditors, giving due regard to the views of the two largest creditors as well the many smaller ones, will be well served by the settlement.

## CONCLUSION

The order of the district court approving the settlement is AFFIRMED.

19