In re FRUIT OF THE LOOM, INC., et al., Debtors.

DDJ Capital Management, LLC, et al., Appellants,

v.

Fruit of the Loom, Inc., et al., Appellees.

Bankruptcy No. 99–04497.
CIV.A. No. 02–36–SLR.

United States District Court, D. Delaware.

March 12, 2002.

Janet Kathleen Stickles, Saul Ewing LLP, Wilmington, DE, for debtors.

Michael R. Lastowski, Duane Morris LLP, Wilmington, DE, for appellants.

## MEMORANDUM ORDER

SUE L. ROBINSON, Chief Judge.

At Wilmington this 12th day of March, 2002, having reviewed the record and heard oral argument on appellants' appeal of the bankruptcy court's order dated December 12, 2001;

IT IS ORDERED that said order is affirmed and the appeal denied, for the reasons that follow:

■ 1. This court has jurisdiction to hear the appeal pursuant to 28 U.S.C. § 158(a)(1), as the December 12, 2001 order is final under the pragmatic test used by the United States Court of Appeals for the Third Circuit to determine the finality of orders entered in bankruptcy proceedings. *See Century Glove, Inc. v. First American Bank of New York,* 860 F.2d 94, 98 (3d Cir.1988).

■ 2. In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See American Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir.1999).

3. By its December 12, 2001 order, the bankruptcy court approved a termination fee (the "Termination Fee") that had been negotiated between debtors and Berkshire Hathaway, Inc. ("Berkshire") to compensate Berkshire for its commitment, as a "stalking horse" bidder, to purchase debtors. The underlying business transaction at issue provides for the sale of substantially all of the debtors' assets to Berkshire for the sum of $835 million, subject to various upward and downward adjustments, pursuant to an agreement between debtors and Berkshire (the "Berkshire Agreement"). The Berkshire Agreement provides that the closing of the sale is contingent upon the confirmation of a chapter 11 plan of reorganization incorporating the Agreement. Debtors agreed to pay Berkshire the Termination Fee if (a) Berkshire's bid were topped by another bidder at the court-approved auction, or

(b) a plan of reorganization incorporating the sale to Berkshire failed to achieve court confirmation.

■ 4. On appeal, appellants contend that the December 12, 2001 order should be vacated because the "coercive effect" of the Termination Fee on creditors voting to accept or reject the proposed plan of reorganization constitutes an improper intrusion on the chapter 11 plan confirmation process. Citing to *In re Braniff Airways Inc.*, 700 F.2d 935 (5th Cir.1983), appellants argue that "[a]ny transaction which impairs the plan solicitation and voting process is impermissible." (D.I. 7 at 16) According to appellants, "[t]hrough its coercive influence on the voting process, the Termination Fee enables the Debtors to lock their estates into a particular plan mode—one that favors the Debtors' Plan over all other plan alternatives. Specifically, the Plan filed by the Debtors not only mandates that certain designated assets be sold and that particular distributions be made to creditors, it also contains broad releases, discharges, injunctions, and/or covenants not to compete . . . ." (D.I. 7 at 17)

5. The court concludes that, rather than impinge on the chapter 11 plan confirmation process, the transaction at bar promotes the process. Unlike the § 363(b) sales discussed in the cases cited by appellants, the proposed sale of debtors' assets to Berkshire and the reorganization consequences thereof are fully disclosed and subject to the creditors' approval through the confirmation process. The "Code's requirement for informed suffrage which is at the heart of Chapter 11," therefore, clearly is satisfied. *In re Lionel Corp.*, 722 F.2d 1063, 1066 (2d Cir.1983).

6. Appellants' argument that the Termination Fee will have a coercive effect on the creditors voting on the plan is over-stated. The court agrees with appellants and with the bankruptcy court that the Termination Fee will be a factor taken into consideration by the creditors when they vote to accept or reject the proposed plan of reorganization. The fact, however, that there are risks and costs related to the Berkshire transaction does not set this transaction apart from any other business transaction in bankruptcy proceedings. As recognized by the court in *In re Cajun Electric Power Cooperative, Inc.*, 119 F.3d 349 (5th Cir.1997), "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly." *Id.* at 354 (quoting *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir.1980)). Starting from the presumption, as this court does, that Berkshire is entitled to the same or equivalent consideration as a "stalking horse" bidder as it would enjoy in a § 363(b) transaction, the only question is whether debtors and Berkshire reached a reasonable accommodation between the amount of the Termination Fee and the interests of the creditors. As observed by the bankruptcy court,

> while I would prefer a slightly different number than that put forward, I think the number put forward I will accept, particularly with the proviso that the incremental amount, that is, any amount payable over the 22.5 [million], will come out of the pocket of the bank lenders, I think to some extent lessens the impact on the creditors voting and, therefore, the coercive effect of this transaction is somewhat lessened. It's not eliminated, but as I reconsidered this matter in light of the points that I just made about if you want to do it the preferred way, and you want to keep a purchaser on the hook for an extended period of time, you are going to have to pay the price. And

under the circumstances I think the price is appropriate.

(D.I. at A277–78) The court finds no error in this analysis.