In re TOWER AUTOMOTIVE INC., et al., Debtors.

Official Committee of Unsecured Creditors of Tower Automotive, et al., Appellants,

v.

Debtors and Debtors in Possession, the Official Committee of Retired Employees, and the Smith Steel Workers D.A.L.U. 19806 AFL–CIO and Other Milwaukee Unions, Appellees.

Official Committee of Unsecured Creditors of Tower Automotive, et al., Appellants,

v.

Tower Automotive, Inc., United Automobile, Aerospace and Agricultural Implement Workers of America, and the IUE, The Industrial Division of the Communications Workers of America AFL–CIO, CLC, Appellees.

Nos. 05–10578 (ALG), 06CV4996 (VM), 06CV7877 (VM).

United States District Court, S.D. New York.

Dec. 15, 2006.

---

Christine Elizabeth Jennings, Jones, Day, New York, NY, Marianne Goldstein Robbins, Previant, Goldberg, Uelmem, et al., Milwaukee, MI, for Debtors.

## DECISION AND ORDER

MARRERO, District Judge.

The Official Committee of Unsecured Creditors (the "Creditors Committee") ap-

peals from a decision of the Bankruptcy Court dated May 19, 2006, and subsequent order dated May 22, 2006, approving the proposed settlements of debtor Tower Automotive, Inc. (the "Debtor" or "Tower") with the unions representing employees and retirees at Tower's Milwaukee facility (the "Milwaukee Unions")[1] and with the Official Committee of Retired Employees (the "Retiree Committee"). The Creditors Committee also appeals from the Bankruptcy Court's order dated August 30, 2006 approving Tower's proposed settlement with the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), and the IUE, the Industrial Division of the Communications Workers of America AFL–CIO, CLC (the "IUE–CWA"). As both of the Creditors Committee's appeals challenge similar provisions of the respective settlements and raise the same objections in both appeals regarding the guaranteed retirement benefits provided to the retirees ("Retirees") under each of the settlements (collectively, the "Retiree Settlements"), the Court has consolidated these proceedings.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

Tower, a supplier of automotive components, filed a voluntary petition for relief under Chapter 11 in the United State Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). On February 14, 2005, the Office of the United States Trustee appointed the Creditors Committee to represent all of Tower's unsecured creditors, "including, e.g., tier two and tier three auto parts suppliers, tradesmen, vendors, large equipment operators—in short, virtually everyone who did business with Tower." (Brief of Appellant Official Committee of Unsecured Creditors of Tower Automotive, Inc., et al., dated July 18, 2006) ("Creditors Committee July 18 B.R., at 4.")

On January 4, 2006, Tower filed a motion to reject its collective bargaining agreements pursuant to 11 U.S.C. § 1113 and to modify retiree benefits pursuant to 11 U.S.C. § 1114 of the Bankruptcy Code (the "§ 1113/1114 Motion"). Tower's motion, which the Creditors Committee joined in support, would have "eliminated medical benefits for future retirees, frozen defined benefit pension plans, cut off the company's contributions to two-multiemployer pension plans, and temporarily suspended 401(k) contributions." (Id., citing Debtor's § 1113/1114 Motion at 40–42 (Docket No. 1159).) It would also have allowed Tower to cease making any contributions toward retirees' medical and prescription drug benefits other than a $5 million cash contribution to a Voluntary Employees Beneficiary Association ("VEBA") trust on behalf of existing retirees. (See id., citing Debtor's 1113/1114 Motion at 43.)

On the eve of trial on Tower's § 1113/1114 Motion, Tower reached a settlement in principle with the Milwaukee Unions. After five days of trial, Tower reached a similar settlement with the Retiree Committee. On April 5, 2006 the settlements were submitted to the Bankruptcy Court for approval. Over the objections of the Creditors Committee, after an evidentiary hearing on April 26, 2006, the settlements were approved by the Bankruptcy Court in a decision dated May 19, 2006.

The Creditors Committee moved for a stay pending appeal, which motion was denied by the Bankruptcy Court. The Creditors Committee then moved to stay the settlement in the district court, which motion was denied by Judge Swain following a hearing on June 29, 2006.

Subsequently, Tower also reached a settlement with the UAW and the IUE–CWA, which is patterned after the settlements with the Milwaukee Unions and the Retiree Committee. The Bankruptcy Court approved these settlements as well, declining to write a separate opinion as the issues raised were previously addressed in the Bankruptcy Court's May 19, 2006 opinion.

---

**1.** The Milwaukee Unions include: Smith Steel Workers D.A.L.U. 19806, AFL–CIO; International Association of Machinists and Aerospace Workers District No. 10; Technical Engineers Association; International Brotherhood of Electrical Workers, Local 663; Service Employees International Union Local 1; UA–Steamfitters Local 601; and the Chicago Council of Carpenters.

## B. SETTLEMENT TERMS

The Retiree Settlements allow Tower to cease payment of retirement benefits, resulting in significant cash savings that Tower believes to be essential to its successful reorganization.[2] In exchange, Tower has established VEBA trusts to provide future benefits for the Retirees and has made and will make certain scheduled cash payments to each of the trusts during the pendency of the bankruptcy proceeding.[3]

Additionally, on the bankruptcy distribution date (the date Tower makes initial distributions to holders of allowed unsecured claims), Tower has agreed to contribute to each of the VEBA trusts created by the Retiree Settlements, in either cash or equity, an amount not less than 20 percent of the Retirees outstanding claims against Tower for the value of the benefits lost as a result of the modifications embodied in each of the Retiree Settlements. For example, under the Milwaukee Unions's settlement, which settlement covers by far the largest group of Retirees, the terms provide for an allowed unsecured claim of $150 million. This $150 million represents the agreed upon value of the Milwaukee Unions's lost benefits. Under this settlement, the VEBA payments Tower is required to make during the pendency of the bankruptcy proceeding are deducted from this $150 million figure, and on the bankruptcy distribution date, the Milwaukee Unions are entitled to at least[4] a 20 percent recovery on the outstanding balance of their $150 million claim.[5] Similarly, the Retiree Committee, the UAW and the IEU–CWA are all guaranteed a minimum 20 percent recovery on their unsecured claims against Tower for benefits lost. The 20 percent recovery is understood by the parties to the Retiree Settlements to be a recovery floor. If the distributions on unsecured claims under Tower's reorganization plan ultimately call for payment on unsecured claims at an amount greater than 20 cents on the dollar, the Retirees are entitled to recovery on their unsecured claims at this higher amount. However, if unsecured creditors are to recover, for example, only five percent on their claims, the Retirees are still guaranteed a 20 percent recovery.

The objections raised by the Creditors Committee in opposing the Bankruptcy Court's approval of the Retiree Settlements, and the arguments it now raises before this Court, concern this guaranteed claim recovery and whether settlements so structured are permissible under the Bankruptcy Code.

## C. THE BANKRUPTCY COURT'S DECISION

As stated by the Bankruptcy Court, the Creditors Committee objected to the Retiree

---

2. Tower's projected costs for funding retiree welfare benefits for 2006 was estimated to be approximately $20 million. (*See* Brief of Appellees Tower Automotive, Inc., et al, dated Aug. 2, 2006) ("Tower Aug. 2 B.R., at 8.")

3. Under the terms of the Milwaukee Unions settlement, Tower is to make VEBA payments of $2,487,500 on July 1, 2006 and October 1, 2006, with quarterly payments of $1,475,000 thereafter during the pendency of the bankruptcy proceeding. (*See* Brief of Appellees Milwaukee Unions, dated Aug. 1, 2006 ("Milwaukee Aug. 1 Br."), at 4.) The Retiree Committee settlement calls for VEBA payments of $500,000 on July 1, 2006, $140,000 for each remaining quarter of 2006, $80,000 per quarter beginning in 2007, and a $1,350,000 contribution (which can be in part equity in Tower) on the effective date of the plan of reorganization. (See Brief of Appellee Official Committee of Retired Employees of Tower Automotive, Inc., dated Aug. 2, 2006) ("Retiree Committee Aug. 2 B.R., at 7"). Finally, Tower "will distribute $500,000 to the IUE–CWA VEBA Trust and $125,000 to the UAW Trust, with additional

distributions to be made upon the earlier of (a) January 1, 2007 and (b) the effective date of Debtor's plan of reorganization." (*See* Brief of Appellant Official Committee of Unsecured Creditors of Tower Automotive, Inc., et al., dated Oct. 16, 2006 ("Creditors Committee Oct. 16 Br."), at 7.)

4. Under the Milwaukee Unions's settlement, the claim floor may be adjusted upward if the bond holders recover more than eighty-five percent on their claims, and there is also a provision for additional back end payments depending on Tower's credit rating in 2009. (*See* Milwaukee Aug. 1 Br. at 5.)

5. Counsel for Tower explained at the hearing before Judge Swain that "20 percent is fixed on a number for the Milwaukee Unions of $150 million . . . That $150 million will be reduced by the amount of money we contribute to the VEBA tomorrow. That is why it wasn't a fixed recovery on the claim; it is a percentage based on whatever the reduced amount of the claim is." (Hearing Transcript, June 29, 2006, at 9.)

Settlements on three grounds: "(i) the Settlements violate the Bankruptcy Code because they guarantee a level of recovery for certain creditors, while other similarly situated creditors do not, as of yet, have any assurance as to their recovery; (ii) the Settlements comprise a *sub rosa* plan of reorganization; and (iii) the Settlements do not satisfy Fed. R. Bankr.P. 9019." (Memorandum of Opinion Approving Settlement Agreements, dated May 19, 2006 ("Mem."), at 4.) The Bankruptcy Court found the Creditors Committee's arguments unpersuasive.

The Bankruptcy Court held that under § 1114 of the Bankruptcy Code general unsecured creditors are not similarly situated to retirees. It also held that the Retiree Settlements do not constitute a *sub rosa* plan of reorganization because the settlements " do not dictate any of the terms of a future plan of reorganization, do not restructure the Debtor's business or finances generally, and do not restrict any rights afforded to creditors in the chapter 11 process, such as the right to vote on a proposed plan of reorganization in the manner they see fit." (*Id.* at 10.) Finally, the Bankruptcy Court, having heard a week of testimony on the § 1113/1114 Motions, found that the Retiree Settlements were in fact reasonable and thus approval was warranted under Bankruptcy Rule 9019.

## II. DISCUSSION

### A. *STANDARD OF REVIEW*

■ In general, a district court reviews a bankruptcy court's factual findings under a clearly erroneous standard and reviews its legal conclusions de novo. *See Truck Drivers Local 807 v. Carey Transp. Inc.,* 816 F.2d 82, 88 (2d Cir.1987); *In re Duffy,* 344 B.R. 237, 242 (S.D.N.Y.2006); *In re DG Acquisition Corp.,* 213 B.R. 883, 884 (S.D.N.Y.1997). The Bankruptcy Court's interpretation of specific sections of the Bankruptcy Code is therefore reviewed by this Court de novo. *See In re Caldor Corp.,* 303 F.3d 161, 166 (2d Cir.2002). Similarly, a district court reviews de novo whether the settlements constitute a *sub rosa* plan of reorganization. *See In re Cajun Elec. Power Cooperative, Inc.,* 119 F.3d 349, 354 (5th Cir.1997). However, "the

bankruptcy judge is uniquely positioned to consider the equities and reasonableness of a particular compromise, and his evaluations and acceptance of the compromised settlements are entitled to deference on a review." *In re Drexel Burnham Lambert Group, Inc.,* 140 B.R. 347, 349 (S.D.N.Y.1992); *see also In re Liu,* 166 F.3d 1200, 1200 (2d Cir.1998) (bankruptcy court's approval of settlement is reviewed "extremely deferentially"). Thus the Bankruptcy Court's determination that the settlements are reasonable should not be overturned unless it is manifestly erroneous or an abuse of discretion. *See In re Iridium Operating LLC,* No. 01 Civ. 5429, 2005 WL 756900, at *4 (S.D.N.Y. April 4, 2005).

### B. *WHETHER THE SETTLEMENTS IMPERMISSIBLY FAVORS RETIREES OVER OTHER UNSECURED CREDITORS*

Bankruptcy Code § 1114 requires that Tower "shall timely pay and shall not modify any retiree benefits, except that—(A) the court, on motion . . . and after notice and a hearing, may order modification of such payments . . .; or (B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments, after which such benefits as modified shall continue to be paid by the trustee." 11 U.S.C. § 1114(e)(1). Section 1114 was added to the Bankruptcy Code as part of the Retiree Benefits Bankruptcy Protection Act of 1998 ("RBBPA"), Pub.L. No. 100–334, 102 Stat. 610, along with § 1129(a)(13), which requires as a condition of plan confirmation that the debtor provide retiree benefits at the level established under § 1114 "for the duration of the period that the debtor has obligated itself to provide such benefits." 11 U.S.C. § 1129(a)(13). Congress's purpose in enacting the RBBPA was "to ensure that the debtors did not seek to effect reorganization 'on the back of retirees' for the benefit of other parties in interest." *In re Ionosphere Clubs, Inc.,* 134 B.R. 515, 523 (Bankr.S.D.N.Y.1991). Section 1114 "provides a status quo safeguard" that requires a debtor to continue timely paying retirement benefits in full unless modified in accordance with § 1114(e)(1)(A) or (B). *Id.*

Any payments required to be made by the debtor prior to when plan confirmation is effective are treated as allowed administrative expenses. 11 U.S.C. § 1114(e)(2). As for the benefits lost as a result of § 1114 modification, the legislative history of the RBBPA makes clear that "retirees will ... have an unsecured claim payable in accordance with the provisions of the Bankruptcy Code and the reorganization plan, for those retiree benefits lost as a result of section 1114 modification." RBBPA, S.Rep. No. 100–119, at 689 (1988) ("RBBPA Senate Report"); *see also id.* at 691 ("Any required payment [due as a result of modification] is treated as an administrative expense; any benefits lost due to modification remain unsecured claims."); *In re Ionosphere Clubs*, 134 B.R. at 527; *In re GF Corp.*, 120 B.R. 421, 423 n. 1 (Bankr.N.D.Ohio 1990).

The Creditors Committee argues that the Retiree Settlements' guarantee of 20 percent recovery on the Retirees' unsecured claims impermissibly favors Retirees over other unsecured creditors and effectively seeks reorganization "on the backs of the other unsecured creditors (many with economic woes of their own), who have no guarantees, and, thus, are left with both diminished recoveries and all the risk that the Debtors will under-perform economically." (Reply Brief of Appellant Official Committee of Unsecured Creditors of Tower Automotive, Inc., et al., dated Aug. 7, 2006 ("Creditors Committee Aug. 7 Reply Br."), at 9.)

It is undisputed that "preferential treatment of a class of creditors is in order only when clearly authorized by Congress." *Howard Delivery Service, Inc. v. Zurich American Ins.,* — U.S. —, —, 126 S.Ct. 2105, 2109, 165 L.Ed.2d 110 (2006). As there is no explicit support in the Bankruptcy Code or case law for favoring retirees' unsecured claims over the unsecured claims of other creditors, the Creditors Committee argues that Retiree Settlements are improper.

While it is true that the Bankruptcy Code does not anywhere expressly prescribe the preferential treatment of the Retirees' unsecured claims over other unsecured claims, the Creditors Committee's objection to the Retiree Settlements is premised on a funda-

mental misapprehension of the nature of the settlements. The 20 percent guaranteed recovery is not itself an unsecured claim. The Retirees have an unsecured claim for *"lost benefits."* The 20 percent guaranteed recovery by definition cannot be considered a lost benefit. It is part of the Retirees' *modified* benefits. While this guaranteed recovery is tied to, or more accurately, requires reference to, the Retiree's unsecured claim recovery, it does not itself constitute an unsecured claim.

Thus, while the settlements do shift some of the risk of Tower's future economic underperformance away from the Retirees to the possible detriment of unsecured creditors generally, this shift is permissible under § 1114, which specifically provides retirees with rights not afforded general unsecured creditors. The presumption under § 1114 is that retiree benefits will continue to be paid in full, unless modified by agreement or court order. *See* 11 U.S.C. § 1114(e)(1). Any retiree payments "required to be made before" plan confirmation is effective have priority as administrative expenses. *See* 11 U.S.C. § 1114(e)(2). The guaranteed 20 percent recovery, although due post-confirmation, was required to be made as part of the preconfirmation settlement. It does not guarantee the value of the Retirees' unsecured claims; rather, it guarantees the minimum value of the modifications to the Retirees' benefits.

The Creditors Committee argues the settlements are at odds with §§ 1114(f) & (g). Section 1114(f) requires the debtor to make a proposal to the authorized representatives of the retirees for those modifications "that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1114(f)(1)(A). The debtor must then meet with the authorized representative of the retirees in an effort to reach a "mutually satisfactory" modification of benefits. 11 U.S.C. § 1114(f)(2). Section 1114(g) allows the court to enter an order modifying benefits if the debtor has made a proposal that satisfies the requirements of § 1114(f), the authorized representative of the retirees refuses to ac-

cept the proposal without good cause and the modification is necessary to permit reorganization, is fair and equitable to all parties, and is "clearly favored by the balance of the equities." 11 U.S.C § 1114(g).

Here, as a "mutually satisfactory" modification of benefits has been agreed to, a § 1114(g) court order, based on a determination that the settlement is necessary to permit reorganization and is fair and equitable to all parties, is not required. The Creditors Committee nonetheless argues that the bankruptcy court must review the settlement in accordance with the standard set forth in § 1114(g), as it would be illogical for a debtor to be allowed to make an agreement with retirees that is not fair and equitable to other unsecured creditors, when the bankruptcy court is expressly prohibited from doing so. However, it is entirely logical that the standard set forth in § 1114(g) would not be implicated in the case of a settlement. Under a provision expressly enacted to safeguard retirees' benefits, if the Retirees voluntarily agree to a significant reduction in benefits, other unsecured creditors should not be able to argue that fairness and equity would require the retirees to agree to an even larger reduction in benefits. As discussed below, this does not mean that unsecured creditors are left without protection from unreasonable settlements, as the Bankruptcy Court must review the settlement under Bankruptcy Rule 9019.

Section 1114(g) also provides that anytime after an order is entered or an agreement modifying benefits is made, the authorized representative of the retirees or the debtor may apply to the court to seek increases or decreases in modified benefits based on the debtor's current financial circumstances, as long as further modification will still allow the debtor to reorganize and is fair and equitable to all parties. *See id.* The Creditors Committee asserts that this procedure allowing for multiple modifications represents Congress's intended means of ensuring that the level of benefits remains properly aligned with the debtor's financial performance. *See* RBBPA Senate Report at 688 ("[t]he modification process under section 1114 need not be a one-time occurrence.

The financial circumstances of the debtor may warrant subsequent modification."). The Creditors Committee argues that the settlements undermine Congress's intentionally flexible scheme for benefits modification by locking in a guaranteed recovery for retirees. The Retiree Settlements, however, are completely in line with Congress's concern that retirees not be locked in to a drastically reduced level of benefits even if the debtor's economic situation unexpectedly improves. The Retiree Settlements lock in only the minimum amount of recovery that the Retirees believe necessary to provide any sort of ongoing meaningful benefits. If Tower ends up in a financial situation that allows all unsecured creditors to receive more than 20 percent on their claims, the Retirees will be entitled to this recovery as well.

Of course, the Creditors Committee is also concerned with the opposite outcome, where Tower's economic situation continues to deteriorate and general unsecured creditors end up receiving only pennies on the dollar. While this outcome is always a possibility in bankruptcy, it is not grounds to unwind the Retiree Settlements. The RBBPA clearly evidences Congress's special concern for the rights of retirees. *See* RBBPA Senate Report at 684 ("This bill recognizes the conflict between the interests of all other unsecured creditors in a Chapter 11 proceeding and the special problems associated with the cut-off of health and insurance benefits to retirees. The special treatment accorded retiree benefit payments is appropriate because of the hardship imposed on elderly recipients when such benefits are suddenly curtailed.").

## C. *WHETHER THE SETTLEMENTS CONSTITUTE A SUB ROSA PLAN*

■ A settlement which has the effect of dictating the terms of the debtor's plan of reorganization prior to the confirmation process cannot not be approved. *See In re Braniff,* 700 F.2d 935, 940 (5th Cir.1983) ("The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* ...."); *In re Iridium,* 2005 WL 756900 at *7 ("the trustee

is not authorized to enter into a settlement if it results into a de facto or *sub rosa* plan of reorganization."); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 887 (Bankr. S.D.N.Y.1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.").

█ The Creditors Committee asserts that the guaranteed recovery under the Retiree Settlements represents an enormous portion of Tower's unencumbered estate; thus, it argues the Retiree Settlements in large measure sets the terms of Tower's reorganization without affording general unsecured creditors the protections afforded them by the reorganization plan approval process.

This Court agrees with the Bankruptcy Court that the Retiree Settlements are not the type of transactions that courts have found to be impermissible *sub rosa* plans. Here, the Bankruptcy Court's review of the relevant case law correctly distinguishes between those circumstances in which pre-plan transactions constitute de facto reorganization plans and circumstances in which such transactions are permissible:

> In extreme circumstances, courts have refused to approve settlements or other transactions by a debtor, such as the sale of all or substantially all assets, without the benefit of a confirmed plan or court-approved disclosure statement and without an adequate business justification. [citations omitted]. Such settlements encroached "on a right afforded creditors or equity holders in the chapter 11 process." *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr.S.D.N.Y.1990).
>
> On the other hand, courts have approved even large and important settlements prior to confirmation of a plan, notwithstanding a *"sub rosa* plan" objection, where the settlements did not dispose of all of the debtor's assets, restrict creditors' rights to vote as they deem fit on a plan of reorganization, or dictate the terms of a plan of reorganization. [citations omitted]. As the Court stated in the *Cajun Electric Power* case, rejecting a *sub rosa* plan argument, the settlement there did "not dispose of all

claims against [the debtor], nor does it restrict creditors' rights to vote as they deem fit on a proposed reorganization plan [nor does it] dispose of virtually all of [the debtor's] assets ...." 119 F.3d at 355. Mem. at 9–10.

The Retiree Settlements do not dispose of all of Tower's assets. Evidence admitted at the trial of the 1113/1114 Motion indicates that Tower expects to emerge from bankruptcy with an enterprise value of approximately $1.2 billion. (*See* Retiree Committee Aug. 2 B.R. at 5, *citing* Lazard Valuation Report (marked as Ex. 64 at § 1113/1114 Hearing.)) The Creditors Committee emphasizes that the Milwaukee Unions's $150 million claim alone represents 56 percent of Tower's total unsecured claims. (*See* Creditors Committee July 18 Br. at 18). While payment of at least 20 percent on this significant claim may represent a substantial portion of Tower's unencumbered estate (although this is disputed), the Retiree Settlements cannot be said to dispose of all or substantially all of Tower's assets. *Cf. In re Cajun Power*, 119 F.3d at 355 (settlement not a *sub rosa* plan where it removed "$107 million in cash and transmission lines worth $20 million from the debtor's estate," as debtor retained as much as $1.1 billion in other assets). Nor do the Retiree Settlements in any way dispose of or release the claims of general unsecured creditors, or restrict their rights to vote on the eventual plan of reorganization. *See In re Iridium*, 2005 WL 756900 at * 8 (finding settlement was not a *sub rosa* plan were it only bound the parties to the settlement and did not prevent objecting creditor "from voting in whatever manner it chooses on any proposed plan.")

In fact, the Retiree Settlements resolve a necessary pre-condition to any proposed plan of reorganization, as the Bankruptcy Code requires that any proposed plan must provide for the continuation of retiree benefits. *See* 11 U.S.C. § 1129(a)(13). Moreover, the Retiree Settlements actually free up cash Tower believes to be necessary to its reorganization.[6] The Retiree Agreements, there-

---

**6.** Counsel for Tower stressed at the Bankruptcy     Court hearing in opposition to the Creditors

fore, are "essential to, and the first step in facilitating, an ultimate plan of reorganization." *In re Iridium,* 2005 WL 756900 at *8.

### D. APPROVAL OF SETTLEMENT UNDER BANKRUPTCY RULE 9019

Bankruptcy Rule 9019 ("Rule 9019") applies to bankruptcy settlements generally and provides, in relevant part, that "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankr.R. 9019(a); *see also In re GF Corp.,* 120 B.R. at 425 (reviewing § 1114 settlement pursuant to Rule 9019). In reviewing a settlement, it is the Bankruptcy Court's responsibility, and this Court's upon review, to "canvass the issues raised and see whether the settlement falls below the lowest point of reasonableness." *In re W.T. Grant & Co.,* 699 F.2d 599, 608 (2d Cir.1983) (internal citations omitted). The reviewing court, however, "may not simply rubber stamp the recommendation of a trustee or debtor in possession but, instead, must make an independent, full and fair assessment of the wisdom of the proposed compromise." *In re Remsen Partners, Ltd.,* 294 B.R. 557, 565 (Bankr.S.D.N.Y.2003).

█ Courts reviewing proposed settlements under Rule 9019 generally consider the following factors: (1) the probability of success in litigation, (2) the difficulties, if any, that might be encountered in collecting a judgment, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, and (4) "the paramount interest of creditors and a proper deference to their reasonable views." *Id.* While the Bankruptcy Court's decision approving the settlement did not explicitly reference these factors, the Bankruptcy Court's decision did state:

[H]aving heard five days of testimony on the 1113/1114 Motions, the Court has no

reason not to endorse a settlement that satisfies the Debtor's principal goal, saving cash, while affording significant protection for the rights that Congress required be preserved for retirees. The litigation posed significant risks for both sides. Despite the Committee's contentions, it is in the best interest of all parties to go forward with these Settlements so that the Debtors and the Committee can proceed to negotiate a plan and end to these cases.

Mem. at 11.

█ Thus, contrary to the Creditors Committee's contentions, the Bankruptcy Court did consider the probability of success in litigation and concluded, after a week of testimony, that it posed significant risks for both sides. As for the difficulty of collecting a judgment absent the settlement, as Tower's § 1113/1114 Motion sought monetary reductions, collection is not an issue.

The Creditors Committee argues that since the settlement occurred after an evidentiary hearing, there would not be any significant further litigation necessary, and thus no attendant inconvenience and delay absent settlement. The Creditors Committee ignores that the Milwaukee Union settled before the § 1113/1114 trial and did not participate in it. If the current settlement were retroactively disapproved, further litigation would be required before the Bankruptcy Court could order a modification of the Milwaukee Unions benefits.[7] More importantly, as the Bankruptcy Court points out, the Retiree Settlements "also resolve a host of complicated grievance, NLRB, arbitration and litigation proceedings between the Debtors and the Milwaukee Unions." (Mem. at 3.) Thus, the complexity, scope and expense of litigation facing the parties if the Retiree Settlements are not approved is a significant factor weighing in favor of approval.

---

Committee's motion to stay the settlements, "without these concessions, our LRP, our long-range plan does not work. We remain cash-flow negative for the entire LRP without these concessions..." (Hearing Transcript, June 28, 2006, at 35.)

**7.** As the Milwaukee Unions point out, "litigation will require the testimony of all Debtors wit-

nesses to provide the Milwaukee Unions with the opportunity to hear the testimony and cross-examine witnesses. In addition, there are seven Milwaukee Unions which would have to provide testimony together with Milwaukee Unions's retained experts." (Milwaukee Unions Aug. 1 Br. at 15.)

Additionally, as the parties to the Retiree Settlements all emphasize, and as the Bankruptcy Court expressly concluded, the Retiree Settlements are in the best interests of all parties, including unsecured creditors. Thus, the Bankruptcy Court did not fail to consider "the paramount interests of creditors with proper deference to their reasonable views." *In re Remsen,* 294 B.R. at 565. The Retirees have all agreed to substantial reductions that reduce the value of their benefits to less than a third of their pre-modification level, which reductions free up significant cash essential for Tower's reorganization, increasing the likelihood that Tower will be able to repay its creditors.[8] Moreover, the deferred recovery, in either cash or equity, that the Retirees have agreed to is certainly a more favorable arrangement for general unsecured creditors than the equivalent value being paid in cash at present into the VEBA trusts.[9]

While the Creditors Committee wishes to gloss over the extent of the Retirees' concessions, the Retiree Settlements force Retirees to survive on significantly reduced health and welfare benefits. In order to maintain benefits at the pre-modification level, individual Retirees must elect COBRA and pay the COBRA premiums out of their own pockets. (*See* Hearing Transcript, June 29, at 8.)

Finally, while it would not be grounds to confirm the Bankruptcy Court's approval of the Retiree Settlements if the settlements were otherwise unreasonable, this Court cannot completely ignore the practical difficulties involved in unwinding the settlements at this point. As the Bankruptcy Court noted in its decision denying the Creditors Committee's motion to stay the settlements pending appeal, "What should a retiree do if he or she has obtained other medical coverage and is now told the settlement is on hold?" (*Order Denying Stay Pending Appeal,* dated June 28, 2006, at 6.) The additional expense and inconvenience to the Retirees, who have already been asked to make significant concessions, would be substantial if the Retiree Settlements were unwound at this point. Moreover, the Retiree Settlements were driven in large part by Tower's belief that avoiding the substantial benefits payments due on July 1, 2006 was essential to Tower's reorganization prospects. If this Court were to strike the Retiree Settlements, Tower would again be obligated to make substantial cash payments that may make any reorganization impossible. Under such circumstances, where the Bankruptcy Court as well as District Court Judge Swain both expressed serious concerns about the harm even staying the settlements would have on the bankruptcy reorganization process, this Court is particularly cautious in its review and "extremely" deferential, *see In re Liu,* 166 F.3d at 1200, to the Bankruptcy Court's determination that the Retiree Settlements are in the best interest of all parties. For all the reasons discussed above, the Court finds that the Bankruptcy Court's determination was neither "clearly erroneous" or "a clear abuse of discretion," *see In re Iridium,* 2005 WL 756900 at *4, and thus affirms the Bank-

8. The Creditors Committee's second set of briefs, filed in support of its appeal of the UAW/IUE–CWA settlements, focuses primarily on the allegedly hastily declining financial situation of Tower, particularly in the months since the Retiree Settlements were approved. The parties vigorously dispute whether this Court can consider the financial information cited by the Creditors Committee, as it is not part of the record on appeal. While the Creditors Committee contends that this Court can take judicial notice of the publicly available information it cites, the Court notes that the § 1114 process normally begins, as it did in this case, with a proposal by the debtor to modify benefits based "on the most complete and reliable information available at the time of such proposal." 11 U.S.C. § 1114(e). Similarly, and necessarily, the Bankruptcy Court's approval of the settlements was limited to the information available at that time. This Court's review is limited to "all documents and evidence bearing on the proceedings below and considered by the bankruptcy judge in reaching his decision." *In re Prudential Lines, Inc.,* No. 93 Civ. 1481, 1994 WL 142017, at *2 (S.D.N.Y. Apr. 20, 1994). This Court does not assess anew whether the settlements, based on the debtor's financial circumstances as of today, are reasonable.

9. As the Bankruptcy Court reasoned, "cash is more risky for the other unsecured creditors because it's funneled. The cash is gone. There's no safety net for the other creditors if you don't ever get to that distribution date. They've taken their cash and they've gone and they're no longer part of the estate, by taking a recovery, the retirees have agreed to take some degree of risk, the risk that we will get there." (Hearing Transcript, June 28, 2006, at 40.)

ruptcy Court's approval of the Retiree Settlements.

## VI. *ORDER*

For the reasons described above, it is hereby

**ORDERED** that the order of the bankruptcy court dated May 22, 2006, based on its decision dated May 19, 2006, approving the settlements between appellee debtor Tower Automotive, Inc. ("Tower") and the appellee unions representing employees and retirees at Tower's Milwaukee facility (the "Milwaukee Unions") and the appellee Official Committee of Retired Employees (the "Retiree Committee") is hereby affirmed and the appeal (Docket No. 1, 06cv4006) of the appellant Official Committee of Unsecured Creditors ("Creditor's Committee") is hereby dismissed; and it is further

**ORDERED** that order of the bankruptcy court dated August 30, 2006, approving the settlements between Tower and the appellees United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), and the IUE, the Industrial Division of the Communications Workers of America AFL–CIO, CLC (the "IUE–CWA") is hereby affirmed, and the appeal of the appellant Creditor's Committee (Docket No. 1, 06cv7877) is hereby dismissed.

The Clerk of the Court is directed to close these cases.

**SO ORDERED.**